**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| Roger Dale Steadman, | ) | Case No.: 04-00004-BGC-7 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| Beverly Barr, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | AP No.: 04-00032-BGC-7 |
| | ) | |
| Roger Dale Steadman, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION ON COMPLAINT
OBJECTING TO DISCHARGE**

The matter before the Court is the Complaint Objecting to Discharge filed by the plaintiff, Beverly Barr, on March 9, 2004.  After notice, a trial was held on November 18, 2004.  Appearing were: Mr. Roger Dale Steadman, the debtor-defendant; his daughter, Ms. Casey Ware, a witness; Mr. Danny Lockhart, Mr. Steadman's attorney; Mrs. Beverly Barr, the plaintiff; Mr. Frank G. Alfano, her attorney; and Mr. Charles Barr, the plaintiff's husband and a witness.

The matter was submitted on the testimony of the parties, Mr. Charles Barr, the plaintiff's husband, and Ms. Casey Ware, the debtor's daughter; exhibits; the record; and arguments and briefs.

## I.  LIABILITY AND DISCHARGEABILITY

### A.  FACTS

#### 1.  Essentially undisputed facts

On July 2, 2001, the defendant's minor daughter, Casey Ware, then age 16, ran over Mrs. Barr in the debtor's pick-up truck.  Mrs. Barr suffered serious bodily injuries.  Mrs. Barr contends that Ms. Ware intentionally ran over her because Mr. Steadman told his daughter to do so.

The event occurred in the street in front of Mrs. Barr's residence at 3025 Cathy Lane in Fultondale, Alabama, where she was residing with her husband, Charles, then age 64; her daughter, Jennifer, then age 20; her daughter, Jordan, then age 3; her son, Jackson, then age 8; and her son, John, then age 17, who is now deceased.[1] At about 5:00 p.m. on the day that the event occurred, Mr. Steadman, then age 41, parked his pick-up truck in the street in front of the Barrs' residence. Mr. Steadman had been drinking alcoholic beverages. Ms. Ware, his 16 year old daughter, was with him. Ms. Ware had been, or still was, either a friend or acquaintance of John Barr, the Barrs' 17 year old son. Mr. Steadman did not know any of the Barrs. But, by his own admission, he went to their residence on that occasion for the express purpose of having a confrontation with John Barr over something that John had purportedly said to Ms. Ware.

John was standing in the front yard when Mr. Steadman arrived at the Barrs' home.[2] Mr. Steadman got out of his truck and yelled at John. He said something to the effect of, "I hear that you want to kill me," or "Why do you want to kill me?" Mr. Barr came outside. He and Mr. Steadman engaged in a verbal altercation which ended in or near the road. Mrs. Barr called the police and then went outside and announced that she had called the police. She eventually arrived in the road or near the edge of the road and the front left corner of Mr. Steadman's truck. How she arrived there is a point of contention.

At that point, Mr. Steadman specifically directed Ms. Ware to move the truck. The manner in which he formulated his command is disputed. In any event, with the intention of proceeding in accordance with her father's command, Ms. Ware pressed the truck's accelerator causing the truck to move suddenly forward and strike Mrs. Barr.

The truck hit Mrs. Barr and knocked her to the ground. Her left leg was dragged under the truck's left front tire. The truck came to rest on her left foot and ankle. At Mr. Barr's behest, Ms. Ware backed the truck off of Mrs. Barr's foot and ankle.

After the incident, Mr. Barr and John began a physical altercation with Mr. Steadman. After that altercation, Mr. Steadman got into the driver's side of the front seat of his truck and drove away from the Barrs'. Ms. Ware was either already sitting in the passenger's side of the truck's seat when Mr. Steadman entered the truck, or got in the truck before Mr. Steadman began driving it away, or jumped in the truck through the passenger's side window as he was driving away.

---

[1] John Barr's death is unrelated to the incident before the Court.

[2] The Court is never inclined to address individuals by their first names, but in this case it is better to refer to John Barr as John rather than Mr. Barr, the term the Court has chosen to refer to the plaintiff's husband.

2

After a short distance, Mr. Steadman met two police cars proceeding toward the Barrs' house. The police stopped Mr. Steadman and placed him under arrest. He was charged with attempted murder and driving while under the influence of alcohol. Eventually, he pled guilty to, and was convicted of, reckless endangerment and driving under the influence.

## 2. Contentions

Mrs. Barr contends: (a) Mr. Steadman is liable for the damages that she suffered as a result of the injuries she received from the incident; and (b) the unliquidated debt now owed by Mr. Steadman, which encompasses those damages, is nondischargeable, by virtue of section 523(a)(6) of the Bankruptcy Code. Mrs. Barr contends that the debt is a "debt for ... a willful and malicious injury by the debtor...." 11 U.S.C. § 523(a)(6).

Mr. Steadman contends that he is not liable for the injuries and resulting damages because he did not tell his daughter to run over Mrs. Barr with his truck and did not intend for his daughter to run over Mrs. Barr.

## 3. The Evidence

### a. Mrs. Beverly Barr's Testimony

Mrs. Barr was employed as a truck driver for Georgia-Pacific where she had been working for almost three years. At the time of the incident she was 40 years old.

On July 2, 2001, the day of the incident, Mrs. Barr left work around 4:30. She was home by 5:00 p.m. Her husband, Charles; her son, John; and her three year old daughter, Jordan, were there. She was in the process of making a telephone call when she heard the sound of vehicle tires squealing from the direction of her front yard. Mr. Barr was in the room with her. Jordan was outside. Mr. Barr went outside to look. Jordan then came in. Mrs. Barr went outside through the front door, where she saw Mr. Steadman and Mr. Barr standing in the driveway. She also saw a red Chevrolet pickup truck parked in the street in front of her house.

Mrs. Barr testified that she had never seen Mr. Steadman before, so she did not know him at that time. She did know his daughter, Ms. Ware, who was an acquaintance of her son John. But she did not know Ms. Ware well as she had talked with her only once in a grocery store parking lot. At the time, John was 17 and Ms. Ware was 16.

Mrs. Barr testified that when she observed Mr. Steadman in the driveway, his right hand was behind his back where she could not see it. He did not have anything in his left hand. She saw and heard Mr. Steadman tell Mr. Barr that he was going to kill their son, John. She testified, "I observed Roger Steadman threatening my son."

3

Transcript at 14. And she testified that she heard Mr. Steadman say he had come there to kill her son. In response to the question, "What did you hear Mr. Steadman say?" Mrs. Barr testified, "He had come there to kill my son." Transcript at 14.

At the time, John was inside the house. According to her testimony, Mrs. Barr went back inside the house and called the police. While she was on the phone, John went outside. She was inside the house for about a minute. After speaking with the police, she returned outside. Mr. Barr and Mr. Steadman were in the front yard. She walked out to the edge of the street in front of her house. Mr. Barr had their daughter's softball bat in his hands. Mr. Steadman was holding a long pole. At that point, no physical altercation occurred between Mr. Barr and John and Mr. Steadman.

Mrs. Barr said that as she positioned herself at the edge of the street in front of her house, Mr. Barr retrieved Jordan, who had followed her. He took Jordan to the front door and put her inside the house. The truck was parked near the center of the street, almost directly in front of the house. The street is no more than 20 feet wide. Mrs. Barr was standing on the edge of the street near her front yard, precisely where she had positioned herself after coming out of the house. She was to the left of the front corner of the truck. Mr. Steadman was in the edge of the front yard, standing in the grass between the house and her. He was swinging the long pole at her and John. She testified, "He had a long pole, stick, and he was swatching at it – switching at me like that." Transcript at 16-17. John was standing behind her, more in front of the truck, but farther away from the truck than she. Mr. Steadman was using the pole to force John and her back away from the house and toward the area in front of the truck.

Mrs. Barr testified that she told Mr. Steadman that he needed to leave because she had called the police. He responded by saying, "No, I am not leaving until I kill every damn one of you." Transcript at 15. By that time, Mr. Steadman had forced John and her close to the area in front of the truck. Mrs. Barr testified that Mr. Steadman then told Ms. Ware, "to scoot over, crank the truck and stomp it." Transcript at 19.

According to her testimony, Mrs. Barr turned and faced the truck. She saw that Ms. Ware had moved from the passenger's seat to the driver's seat. Mr. Steadman was standing to her right, about three or four feet from her, in the gutter of the street in front of her house. Mrs. Barr testified that immediately after she turned toward the truck, Mr. Steadman told Ms. Ware again, "to stomp it....," and, simultaneously, struck Mrs. Barr across the shoulders with the pole. Transcript at 20. Ms. Ware then accelerated the truck and turned its wheels toward Mrs. Barr. The truck struck her first in the abdomen. Mrs. Barr's left foot and ankle became trapped under the left front wheel when the truck continued forward. When Ms. Ware eventually stopped the truck, it was resting on Mrs. Barr's left foot and ankle.

According to Mrs. Barr, Mr. Barr told Ms. Ware to get the truck off of her. To that, Ms. Ware replied, "Oh, am I on top of her?" Transcript at 22. Ms. Ware then started the truck and moved it in reverse off of Mrs. Barr's foot and ankle. Mrs. Barr

4

testified, "I was bleeding really, really bad and I thought I was dying."  Transcript at 22.
At that point, Mr. Barr bent down to attend to Mrs. Barr.  When he did Mr. Steadman
attacked him from behind and hit him with the pole.  Mr. Barr then stood up, caught the
pole in his hands, and pushed Mr. Steadman away.

The fight continued.  After repelling Mr. Steadman's attack, Mr. Barr returned to
render assistance to Mrs. Barr, at which point, Mr. Steadman would renew his attack on
Mr. Barr with the pole.  Once, Mr. Barr grabbed the pole and tried to pull it away from
Mr. Steadman.  He was unsuccessful so he let the pole go.  That caused Mr. Steadman
to fall into the road.  Several times, Mr. Barr successfully disarmed Mr. Steadman and
threw the pole into the yard, but each time, Mr. Steadman retrieved the pole and
renewed his attack on Mr. Barr.

Mrs. Barr said that once, when Mr. Steadman was attempting to attack Mr. Barr
from behind, John struck Mr. Steadman, who fell into the front yard.  Ms. Ware then
jumped out of the truck and attempted to strike John, but missed and went tumbling into
the yard.  Mrs. Barr testified, "My husband was trying to help me, to keep me calm or
whatever and, when [Mr. Steadman] come the last time to hit my husband, John come
and hit him and knocked him back in the yard and Ms. Ware come out of the truck with
her arm in the air and swung at my son and he just ducked and she nosedived into the
yard herself."  Transcript at 70 (parenthetical added).

Mrs. Barr testified that Mr. Barr finally grabbed the softball bat and struck Mr.
Steadman with it.  At the time, Mr. Steadman was in the gutter of the road in front of the
house by the driver's side front wheel of the truck.  After Mr. Barr struck him, Mr.
Steadman fell to the ground.  He then got up and got into the truck with Ms. Ware and
they left.  Mrs. Barr saw the truck leave but did not see who was driving it.

Mrs. Barr was taken to the hospital where she was admitted.  According to her
testimony, she remained there for the next 13 days.[3]  Mrs. Barr testified that in her
judgment Mr. Steadman was heavily intoxicated during the time he was at her
residence.  She said she could smell alcohol on him and that his language, manner of
speaking, demeanor, and actions were characteristic of an intoxicated person and
comparable to the language, manner of speaking, demeanor, and actions of other
intoxicated persons that she has observed in the past.

Mr. Steadman attempted to illustrate that Mrs. Barr's trial testimony was, in one
minor respect, different from the testimony that she gave in her deposition.  As
indicated above, Mrs. Barr testified at trial that she heard Mr. Steadman say to Ms.

---

[3] Mrs. Barr's medical records reflect that she was actually discharged 11 days after she was
admitted to the hospital.  Her testimony regarding the nature and extent of her injuries, medical
treatment, rehabilitation and recovery are discussed below in the section entitled "Damages."

5

Ware, "scoot over, crank the truck and stomp it." Transcript at 19. In her deposition, she testified that she could not remember hearing anyone tell Ms. Ware to crank the truck. Her deposition reads in part:

> Q. Question on line number five, "Did you hear anybody tell her to crank it?" What was your answer on line number seven?
> A. On the same page?
> Q. The same page. Would you read the answer?
> A. I don't think so. I don't remember.

Transcript at 62-63.

The Court finds that whether Mrs. Barr heard Mr. Steadman tell Ms. Ware to crank the truck is insignificant. The undenied fact is that Ms. Ware did crank the truck. What is significant is that Mrs. Barr heard Mr. Steadman say, "scoot over... and stomp it." And there is apparently no inconsistency there or the Court would have been told.

### b. Mr. Charles Barr's Testimony

Mr. Barr has worked for Royal Cup Coffee as a transport truck driver. At the time of the incident, he was about 64 years old.

Mr. Barr testified that on July 2, 2001, the day of the incident, he arrived home from work around noon and was home in the evening at around 5:00 p.m. when the events occurred.

He testified that Mrs. Barr had just arrived home with their three year old daughter, Jordan, who Mrs. Barr had picked up from day care. Mr. Barr testified that while Mrs. Barr was making a telephone call, he heard the sound of, "tires squeaking and gravel, dirt flying." Transcript at 102. He could hear the sound of debris hitting the house. After a few minutes, he heard the front door open. He then jumped up and ran out the front door, having remembered that Jordan was outside on the swings. Before going out, he met John coming in the front door. He asked John, "John, what is going on?" Transcript at 103. John pointed to the driveway where Mr. Steadman was standing.

Mr. Barr had met Mr. Steadman once before, when Mr. Steadman picked up Ms. Ware from the Barrs' residence after she visited John.

At this time, Mr. Barr told John to remain in the house, and that he would take care of the situation. Mr. Barr then walked down to the driveway to about a foot and a half from Mr. Steadman. Mr. Steadman had one of his hands in his back pocket. He saw Mr. Steadman's vehicle sitting in the middle of the road in front of his house.

Case 04-00032-TOM   Doc 24   Filed 09/28/05   Entered 09/28/05 12:42:28   Desc Main
Document     Page 6 of 47

Mr. Barr testified that Mr. Steadman told him, "I came here to kill your son." Transcript at 109. Mr. Barr responded, "No, you didn't." Transcript at 109. Mr. Steadman then said, "Yes, I did. I'm going to kill you, too." Transcript at 109. All the time, Mr. Steadman had one of his hands in his back pocket, as if he was holding something. Mr. Barr said that he could not see what Mr. Steadman was holding in his back pocket, if anything. Mr. Barr's hands were empty.

According to Mr. Barr, at that point John ran up and handed him one of his daughter's softball bats. Mr. Barr testified that he told John to, "Go back in the house and tell your mama to call the law right now." Transcript at 109. Mr. Steadman then pulled a paint scraper out of his pocket and threw it into the back of his pickup truck. He then ran over to the truck and retrieved a yellow extendable paint pole handle from the back of the truck and returned to Mr. Barr with the handle resting over his shoulder. The paint pole was about four and a half to five feet long. Mr. Steadman's actions prompted Mr. Barr to raise the bat that he was holding and say, to Mr. Steadman, "You're going to make me mad if you hit me with that stick. You better get in the truck and go while you can because this bat is not going to make you mad, it is going to hurt you." Transcript at 111.

Mr. Barr testified that at that point John and Mrs. Barr were standing right behind him. Mrs. Barr told him that she had called the police. He testified that his three year old daughter Jordan was in the middle of the yard, "looking at us, just having a fit, jumping up and down and crying." Transcript at 111. He ran over and picked Jordan up, and headed toward the front door. At the time, Mr. Steadman was standing between John and Mrs. Barr and the house, swinging the paint handle at them. According to Mr. Barr, Mr. Steadman was forcing John and Mrs. Barr into the road directly in front of his truck and making it impossible for them to retreat back to the house. Mr. Barr testified, "He was running around there like a shepherd dog herding cattle with that stick. He was just going around and around the upper side of them, keeping them back toward the truck as hard as he could." Transcript at 143.

Mr. Barr testified that as he was carrying Jordan toward the front door, he heard Mr. Steadman shout, "Scoot over and crank it up and stomp it," and "I am going to kill every one of them before I leave." Transcript at 112. When he heard that Mr. Barr pushed Jordan inside the house and ran toward the truck. While in route, he saw Mr. Steadman's daughter Ms. Ware in the driver's seat of Mr. Steadman's truck. At that time she cranked the truck. Mr. Barr testified that he heard Mr. Steadman repeat his command to Ms. Ware, "I said stomp it." Transcript at 113. Ms. Ware complied, driving the truck at Mrs. Barr, who appeared to attempt to avoid the oncoming vehicle by moving in the direction of the house. According to Mr. Barr, Ms. Ware turned the wheels of the truck as hard as she could toward Mrs. Barr. At the same time, according to Mr. Barr, Mr. Steadman stopped Mrs. Barr's attempted escape by striking her across the back of the shoulder with the paint pole. Mrs. Barr then lost her balance, and as she fell sideways her foot became caught under the truck's front tire.

7

According to Mr. Barr's testimony, after Mrs. Barr was hit by the truck, he ran to her aid. He explained that the truck's front tire was sitting on her foot. He told Ms. Ware to take the truck out of gear so that he could push it off of Mrs. Barr. Instead, Ms. Ware cranked the truck, put it in reverse and jerked it backwards. Transcript at 115.

Mr. Barr testified that Mrs. Barr's foot was, "tore all to pieces...." Transcript at 115. He held Mrs. Barr and talked to her. Mrs. Barr was hysterical. He testified that she said, "'I am dying. I am dying.'" Transcript at 115.

According to Mr. Barr, he then heard John shout, "Daddy, watch it. He is fixing to hit you." Transcript at 115. He then saw Mr. Steadman swinging the paint pole at him. He grabbed the pole, wrenched it from Mr. Steadman's hands, threw it as far as he could into the yard. He then returned to his wife.

John warned Mr. Barr again of an impending attack from Mr. Steadman, shouting, "Daddy, he is fixing to hit you again." Transcript at 115. When he did, Mr. Barr threw himself sideways. Mr. Steadman hit him across the leg with the paint pole. Mr. Barr grabbed the pole, but Mr. Steadman held the other end. Mr. Barr struck Mr. Steadman lightly on the shoulder with the softball bat, but Mr. Steadman refused to release the pole. The two men continued to tug on the paint pole. Finally, Mr. Barr pushed Mr. Steadman and Mr. Steadman fell to the ground on his back in the gutter along the street in front of the Barr's house. He attempted to kick Mr. Barr. But Mr. Barr avoided Mr. Steadman's kick and, "bumped [Mr. Steadman] a time or two with the bat on his forehead and on his chest with the end of the bat, not hitting him." Transcript at 116 (parenthetical added). Mr. Barr said that at that moment Mrs. Barr screamed, "Don't hit him no more." Transcript at 116. Mr. Barr left Mr. Steadman and returned to assist Mrs. Barr.

According to Mr. Barr, Mr. Steadman got up and attempted to hit John with the pole but John knocked Mr. Steadman back to the ground. Mr. Steadman got up and ran to the steps leading to the front door of the Barrs' residence. Mr. Barr testified that he warned Ms. Ware, "You better go and get him because he is fixing to get hurt if he goes in my house. He is fixing to get bad hurt." Transcript at 117.

According to Mr. Barr, Ms. Ware went to Mr. Steadman, led him back to the truck and opened the door. Mr. Steadman got into the driver's seat of the truck and cranked it. Before Ms. Ware could get around to the passenger's side, Mr. Steadman turned the truck's wheels toward Mrs. Barr, who was laying three or four feet to the left front of the truck, and began moving it in her direction. Mr. Barr then swung the softball bat at Mr. Steadman and told him to get it away from Mrs. Barr. In response, Mr. Steadman straightened the wheels of the truck and began driving it down the road. Ms. Ware, according to Mr. Barr's testimony, dove into the truck through the passenger side window as the truck was moving.

8

Mr. Steadman drove about two hundred and fifty feet before he was stopped by the police, who arrested him.

Mr. Barr testified that in his opinion Mr. Steadman was under the influence of alcohol. He said that Mr. Steadman was slurring his words, and grinning and walking in a manner characteristic of an intoxicated person and that his manner of speaking, demeanor, and actions were consistent with the manner of speaking, demeanor, and actions of other intoxicated persons that he has observed in the past.

In the morning after the incident, Mr. Barr took a photograph of the part of the street where Mrs. Barr had been run over. The photograph, which was admitted into evidence as Plaintiff's Exhibit 4(c), depicts a streak in the road. Mr. Barr testified that the streak was eleven and a half feet long. It was made up of Mrs. Barr's blood and fragments of her flesh and sock.

### c. Mr. Roger Steadman's Testimony

Mr. Steadman testified that on July 2, 2001, the day of the incident, he and his daughter Ms. Ware went for an outing at Smith Lake Park. At the time he was about 41 years old and Ms. Ware was 16.

### 1. Mr. Steadman's Insobriety

Mr. Steadman admitted that he consumed alcoholic beverages before going to the Barrs' residence. He said that his consumption of alcoholic beverages is not unusual; that he consumes alcoholic beverages on a regular basis; that he enjoys consuming alcoholic beverages; and that he enjoys how alcoholic beverages make him feel when he consumes them. In his deposition, he testified that he was under the influence of alcohol when the events at the Barrs' occurred and after he drove his truck away from the Barrs' he was stopped by the police and was charged with driving while intoxicated. He later pled guilty to that offense.

 Mr. Steadman's testimony about the specifics of what he drank prior to arriving at the Barrs' residence was inconsistent and contradictory, but at the least established that he had consumed a substantial amount of alcohol before reaching the Barrs'.

At trial, Mr Steadman first insisted that he had consumed four beers and two or three ounces of whiskey at some point during the day of the incident, but that his consumption of those beverages had no adverse effect on his ability to drive his truck, or on his ability to speak, or on his ability to make rational decisions, or on his ability to walk. He said that the only reason that he testified in his deposition that he was "under the influence of alcohol" when the incident occurred, was because he believed, "any consumption of alcohol is under the influence." Transcript at 176. Mr. Steadman then agreed that even if he had only consumed one beer, that would also be, "under the influence of alcohol." Transcript at 176.

Case 04-00032-TOM    Doc 24    Filed 09/28/05    Entered 09/28/05 12:42:28    Desc Main
Document    Page 9 of 47

On cross examination at trial Mr. Steadman acknowledged that at his deposition he admitted that he was under the influence of alcohol when he went to the Barrs' residence and that prior to going to the Barrs' he had purchased a six-pack of beer at a convenience store and consumed all six of those beers, and that, at some point earlier in the day, he had consumed an entire half-pint of liquor. He testified:

Q. Mr. Steadman, you testified in your deposition – have you got it right there before you? It is marked as number seven. Do you see it there, page thirty-three?
A. Okay.
Q. Do you see that?
A. Okay. What are we looking for?
Q. Page thirty-three.
A. Okay.
Q. Do you see there where it says, "Do they sell beer at Smith Lake Park?" on line three?
A. On page thirty-three?
Q. Yes, sir.
A. Yes, I see that.
Q. "Do they sell beer at Smith Lake Park?" And do you see your answer. It says answer, "I don't know."
A. Right.
Q. Okay. Do you see down below the next question: "Well, where did you get it from?" Do you see that?
A. Yes.
Q. Do you see your answer: "At the convenience store." Do you see that?
A. Yes, I see that.
Q. And the next question, "How much beer did you buy?" Do you see that?
A. Yes.
Q. And you see your answer?
A. Right.
Q. And what did you say? Answer, "How much did you buy?"
A. Right.
Q. What did you say?
A. Six.
Q. You said "six," right?
A. Right.
Q. And the next question you see, "How much did you drink?"
A. Yes.
Q. Do you see the answer there?
A. Okay.
Q. What did you say, how much you drank?
A. Six.

10

Q.     You said you bought six, you drank six, right?
A.     Yeah, that is what I said.
Q.     Okay.  Then if you go on down there a little bit, do you see the question below there on line twenty.  It says, "Do you remember Ms. Ware testifying that you had a bottle of hard liquor."  Do you see that?
A.     Yes.
Q.     And you said, "Yeah."
A.     Right.
Q.     And I said, "Well, was she lying or telling the truth?"  Right?
A.     Right.
Q.     And then your answer is what?  Can you see your answer?
A.     Oh, I drank some liquor.
Q.     And you said that was earlier in the day?
A.     Yes.
Q.     "And how much liquor did you drink?"  And what is your answer?
A.     "A half pint."
Q.     Okay.  It says you drank a half a pint.  It didn't say you drank two or three ounces and it didn't say you drank four beers.  You drank six and you drank a half a pint.  Isn't that what you testified to?
A.     I drank out of the half a pint.
Q.     Well, that is not what you said, though, is it?  The question is how much liquor had you had to drink, and your answer was a half pint.
A.     Yeah, that is what I said.

Transcript at 181-84.

On redirect examination, Mr. Steadman attempted to explain the conflicts between his trial testimony and his deposition testimony by complaining that he did not understand the questions asked.  He said that he did not understand the question, "how much liquor did you drink?"  And he explained that when he answered at his deposition that he drank a half-pint of liquor, he really meant, or meant to say, that he had been drinking from a half-pint bottle of liquor but did not drink all of it.  And he complained that he did not understand the question, "How much did you drink?", a question asked in reference to his consumption of the beers that he bought at the convenience store. He explained that when he said that he had consumed all six beers, he meant by that, or meant to say, "I drank six during the day but I would stop.  I drank two, stopped; went into the park and when I come out from the park, I drank the other four."  Transcript at 186.

The questions Mr. Steadman claims to have misunderstood were clear.  And he did not explain how they were not.  Therefore, in order to conclude that Mr. Steadman did not in fact drink an entire half-pint of liquor and six beers sometime during the day preceding his arrival at the Barrs', the Court would have to conclude that Mr. Steadman was not capable of understanding those clear questions, which the Court cannot do.

11

After hearing and viewing Mr. Steadman's trial testimony, it is clear to the Court that Mr. Steadman was quite capable of understanding them and responding to them.

Consequently, in accordance with his deposition testimony, and other evidence relevant to the issue, including Mr. Steadman's admitted consumption of alcoholic beverages of some quantity, the observations made by both Mr. and Mrs. Barr regarding his, as well as his guilty plea to the charge of driving while intoxicated, the Court must conclude that Mr. Steadman was indeed inebriated to some extent before, during, and immediately after the incident at the Barrs'.

## 2. Mr. Steadman's Version of the Incident

Neither Mr. Steadman nor his daughter testified about when they arrived at Smith Lake Park or how long they stayed there. But Mr. Steadman testified that when they left the park in his pick-up truck that he went to the Barrs' residence for the express purpose of confronting John Barr about something he had supposedly said to Ms. Ware. He testified that Ms. Ware told him that John told her that he was going to kill him. John was 17 years old at the time.

Mr. Steadman said that upon his arrival at Cathy Lane, the location of the Barrs' residence, he drove past their residence, which was on the right hand side of the street. Mr. Steadman denied that he caused his truck tires to spin or skid, or that it threw any gravel or debris from its tires.

As he drove past, referring to John, Ms. Ware said, "Oh, there he is." Transcript at 205. Mr. Steadman then proceeded to end of the street, where he turned around and went back to the Barrs' residence. The house then was on the left hand side of the street in relation to the direction his truck was facing. When the truck was in front of the Barrs' residence, Mr. Steadman stopped the truck and got out, leaving the truck parked in the street.

As stated above, Mr. Steadman admitted that his purpose in going to the Barrs' residence was to initiate a confrontation with John Barr, age 17. When he arrived at the Barrs', Mr. Steadman verbally engaged John in an aggressive and accusatory manner:

> Q.  Well, in your deposition didn't you testify that Ms. Ware had told you that he had made a threat on you and that you wanted to confront him about it?
> A.  Yes.
> Q.  Okay. And so you made the decision to go see this seventeen year-old John Barr?
> A.  Yeah, to ride by the house.
> Q.  And you got his attention and he came outside, which is what you wanted; right?
> A.  Yes.

12

> Q. Okay. And when he came outside, you confronted him?
> A. Yes.
> Q. You said, "I hear you want to kill me," right?
> A. That's right.
> Q. And you began the confrontation that occurred on this day; did you not?
> A. Yes.
> ....
>
> Q. And on this particular occasion you had decided that you would confront this young man and have it out with him?
> A. Yes.

Transcript at 154-55.

In regard to his actions, Mr. Steadman said that, upon leaving the truck, he took a position, "standing at the back of my truck," which "was in the middle of the street." Transcript at 207. Those statements were inconsistent with other testimony. At one point in his testimony, he said that the truck was in the middle of the road and that he essentially stood within a couple of feet of the truck the entire time he was at the Barrs' residence. In another part of his testimony, he said that the truck was parked on the, "opposite side of the road," and that upon getting out of his truck he proceeded to a point in the street next to the Barrs' driveway. He testified:

> Q. When you got out of the truck, did you go into the Barr's yard?
> A. No.
> Q. Where did you go?
> A. To the edge of the street – to the edge of the yard, not in the driveway but right at the end of the driveway, but I was still in the street.

Transcript at 178.

Mr. Steadman said that John was in the driveway, somewhere near the front door. He said to John, "Hey, I heard you wanted to kill me." Transcript at 207. John did not respond, but instead went into the house. According to Mr. Steadman, Mr. Barr then came out of the house, went to his garage where he got a baseball bat, walked up the driveway to the street, and approached Mr. Steadman.[4]

---

[4] As will be discussed in detail below, Mr. Steadman's testimony about his initial contact and the circumstances of that confrontation significantly conflicts with his daughter's testimony on the same subject. She testified that it was John, and not Mr. Barr, who came out of the house with a baseball bat in hand, and walked up the driveway to the street to confront her father.

13

At first Mr. Steadman characterized himself as being unarmed before he was approached by Mr. Barr. But he later admitted that he was holding a paint scraper in his hand. When Mr. Barr approached him with the bat, he threw the paint scraper into the back of his truck and picked up a paint roller pole from the same place. He said that he only retrieved the paint pole from the truck because he needed to defend himself against Mr. Barr who was swinging the bat in his direction.

Mr. Steadman said that, as Mr. Barr approached, he just stood there holding the paint pole stationary in front of him. Mr. Barr was waiving the bat at him. John, in the meantime, had come outside and joined his father. They were all three standing in the middle of the road. Mrs. Barr had, at the time, not yet exited the house.

According to Mr. Steadman, he and Mr. Barr were having a conversation as they faced one another. At one point in his testimony, Mr. Steadman said that he does not recall either what Mr. Barr said to him or what he said to Mr. Barr during that conversation. At another point in his testimony, however, he said that Mr. Barr told him that he was going to beat him up, or hit him with the bat, or words to that effect.

Mr. Steadman denied telling Mr. Barr that he was going to kill John; denied saying that he was not going to leave until he had killed everyone of the Barrs; denied that he otherwise threatened to kill anyone; and denied that he ever intended to kill anyone.

Additionally, Mr. Steadman denied that he ever approached the Barrs' front door or even went into the Barrs' front yard.

Mr. Steadman said that while he and Mr. Barr were standing in the street, locked in stalemate, Mrs. Barr came out of the house and announced that the police were on their way. At that point in time, Mr. Steadman, according to his testimony, was standing a couple of feet from the truck, near the driver's door. He denied that Mr. Barr attended to his daughter Jordan at any point in time while he was at the Barrs' residence.

Mr. Steadman testified that he decided to leave when he heard that the police were coming. He admitted that his decision to leave was prompted by his belief that the police, upon their arrival, would arrest him. He testified:

Q.    Mr. Steadman, why were you leaving because the police were coming?
A.    Well, I figured out the police would try to arrest me.

Transcript at 171.

Mr. Steadman's admission that he wanted to leave the Barrs' residence because he believed that, if he stayed, the police would arrest him is significant. It represents an acknowledgment on his part that he was in the wrong and that his actions at the Barrs'

14

residence were illegal. Because if his actions were not illegal, he would have had no reason to fear that they would probably lead to his arrest.

Mr. Steadman, however, attempted to ameliorate his indirect acknowledgment of guilt by explaining that his decision to leave was also motivated by Mr. Barrs' aggressive actions. He said he was standing in the street by his truck when Mr. Barr retrieved the bat from his basement. The evidence is that at that point he had ample opportunity to get in his truck and leave. Instead, he armed himself with the paint pole and proceeded to wait for Mr. Barr to walk up the driveway into the street. It is apparent from those actions that Mr. Steadman intended to engage Mr. Barr, a 64 year old man, in some sort of physical altercation, and that he had in fact come to the Barrs' residence for the very purpose of engaging in such an altercation with either John or Mr. Barr. He was dissuaded from that objective only by his fear of arrest, prosecution, and confinement by the authorities. After learning that the police were coming, according to his testimony Mr. Steadman proceeded around to the front of the truck.

The Court does not accept Mr. Steadman's assertion that he was afraid of being assaulted by Mr. Barr and that he did not run away from Mr. Barr for fear of being struck from behind by the bat. According to his own testimony, Mr. Steadman distanced himself from Mr. Barr by going to the front of the truck, before he told Ms. Ware to move it. If he could do that, then he could have, at any point, run far away from Mr. Barr. He could have gone to either end of the street and beyond had he desired to do so. Or he could have simply gotten into the truck through the driver's side door and drove away.

Mr. Steadman testified that when he had positioned himself in front of the truck, about three feet from it, and was standing in the center of the truck's hood, he told Ms. Ware, "to crank the truck up and ease down the street." Transcript at 211. That testimony is hardly plausible. It requires one to believe that Mr. Steadman intentionally placed himself in a position to be struck by the truck as it moved forward, which would have almost inevitably resulted in him being seriously injured.

Mr. Steadman denied that he told Ms. Ware more than once to move the truck. That denial directly conflicts with Ms. Ware's testimony. <u>She testified that he told her twice to move the truck, which agrees with the Barrs' rendition of the events</u>.[5]

---

[5] The fact that Ms. Ware and the Barrs' testimony agree on this point is probably the most important fact in resolving the pending matter. Mr. Steadman admits that he asked Ms. Ware to move the truck, but he disagrees that he told her that <u>twice</u>. If he had told her only once, or even <u>ordered</u> her to move it once, he could have mounted a stronger defense. But, both Mr. and Mrs. Barr <u>and</u> Ms. Ware, the debtor's daughter, testified that Mr. Steadman told or ordered Ms. Ware <u>twice</u> to drive the truck. Because the debtor's <u>intent</u> is so important in a willful and malicious non-dischargeability proceeding, the clear evidence that he told his daughter, not once, but twice, to drive the truck is significant. And in fact, Ms. Ware testified that after the first command, she did not want to drive the truck because someone could have been hurt. But that after her father told her again she complied.

Case 04-00032-TOM    Doc 24    Filed 09/28/05    Entered 09/28/05 12:42:28    Desc Main
Document      Page 15 of 47

Mr. Steadman also denied that he told Ms. Ware, when referring to the truck's accelerator, to "stomp it."

Mr. Steadman said that when he told Ms. Ware to move the truck, Mrs. Barr who had since moved from her front door to the street, stepped in front of the truck and said, "No, you are not going anywhere." Transcript at 211. According to Mr. Steadman, at that point, Ms. Ware proceeded to comply with his command. She cranked the truck and pressed the accelerator. The truck moved forward and struck both Mrs. Barr and him.

Mr. Steadman said that when the truck started moving he was standing about three feet in front of it and that after it hit him he was pulled along for about a foot or two. He said that the impact from the truck knocked him down. When the truck stopped he was on the ground up to his chest under the truck.[6]

Mr. Steadman was not asked, and did not say, how fast the truck was going when it purportedly hit him. He did, however, testify that, other than a few superficial scratches and bruises, he received no injury from being run over by the truck. That is improbable. If Mr. Steadman was hit by the truck when Ms. Ware "floored" the accelerator, it is more likely than not that he would have been seriously injured like Mrs. Barr. That conclusion is also supported, if not compelled, by Ms. Ware's testimony. As will be discussed later, Ms. Ware said that she did not know where her father was when she floored the accelerator. Since she was ostensibly looking out the front window of the truck at that time, if her father had been in front of the truck, as he contends, when she "floored" the accelerator, certainly she would have seen him. To reiterate, Ms. Ware testified that she did not know where he was.

Mr. Steadman said that when the truck stopped, he pulled himself out from under it and stood up, at which time he saw the truck's front tire sitting on Mrs. Barr's leg. He had dropped the paint pole when he was purportedly hit by the truck. So he was not holding it as he observed Mrs. Barr. While he was standing there in front of the truck looking down at Mrs. Barr, Mr. Barr hit him in the jaw with the bat. He testified:

Q.   And what happened next?
A.   My daughter cranked the truck up and all of a sudden she ran over me and Ms. Barr at the same time.
Q.   Did you actually see her run over Ms. Barr?
A.   Yes.
Q.   And were you at that time still in front of the truck or had you been hit at that time, or just what was the events that were occurring at that time?

---

[6] As discussed in detail below, Ms. Ware testified that she "floored" the accelerator, which is also consistent with the Barrs' renditions of the events.

A. Well, I pulled myself out from under the truck and I had seen the tire was on Ms. Barr's leg, and I was standing there looking, saying, "Oh, no."

Q. After that time where was the stick, the paint stick?

A. I have no idea. I let it go.

Q. All right. At that time had anybody hit you with a baseball bat or hit you with a fist?

A. At that time when I was looking at her leg is when I got hit with a ball bat.

Q. Who hit you with a ball bat?

A. Mr. Barr.

Transcript at 212-13.

Mr. Steadman <u>did not testify</u> that Ms. Ware immediately backed the truck off of Mrs. Barr's leg, that Mr. Barr attacked him after the truck was backed off of Mrs. Barr's leg, or that he was lying on the ground attempting to extricate himself from beneath the truck when he was purportedly attacked. To the contrary, Mr. Steadman's testimony, literally taken, is that Mr. Barr attacked him while Mrs. Barr was still trapped under the truck and prior to making any attempt to rescue his wife. In addition, his testimony is that he was standing when he was purportedly attacked, having already extricated himself from beneath the truck. <u>That assertion is completely contrary to Ms. Ware's rendition of the events. She said, as discussed in detail below, that Mr. Barr and John did not attack her father until after she backed the truck off of Mrs. Barr and that, when they began attacking him, he was not standing, but instead was still lying on the ground in front of the truck, attempting to get up</u>.

In contrast to Mr. Steadman's testimony, common sense dictates that when Mr. Barr saw his wife struck by the truck, thrown to the ground, trapped under a wheel of the truck and, dragged along the pavement, he would have abandoned any immediate thoughts of hitting Mr. Steadman. It is more probable that his first impulse would have been to offer immediate assistance to Mrs. Barr. And according to Mr. Barr's testimony, that is precisely what he did. That action is imminently more reasonable than believing that he abandoned his wife in favor of immediately attacking Mr. Steadman.

Continuing, Mr. Steadman testified that Mr. Barr hit him at least three or four times with the bat in the back, left arm, and forearm. John then hit him with his fists two or three times. As a result of being hit by Mr. Barr and John, he ended up on the ground.

According to Mr. Steadman, Ms. Ware was still in the truck when Mr. Barr first hit him, but he thinks that she later got out of the truck. Again, as discussed below, that testimony conflicts with Ms. Ware's testimony who stated that she was not in the truck when Mr. Barr first hit her father.

17

Finally, according to Mr. Steadman, after Mr. Barr and John stopped hitting him, he got up and got into the truck on the driver's side. Ms. Ware was already sitting in the truck, on the passenger side. He started the truck and drove off. After about seventy-five yards, he was stopped by two police cars. The policemen directed him to get out of the vehicle, which he did. They then placed him under arrest. He was transported to the police station in one of the cars. The police placed Ms. Ware in the other car.

Mr. Steadman was charged with attempted murder and assault. As part of a plea agreement, the charge was ultimately reduced to reckless endangerment, a misdemeanor, to which he pled guilty.

Mr. Steadman identified several photographs that were admitted into evidence at his request. He said that his mother took the photographs the day after the incident. The photographs depict bruises, scrapes, and scratches on Mr. Steadman. Defendant's Exhibit No. 1 and Exhibit No. 2 are photographs of his buttocks, back, and the rear half of his left arm. Large purple bruises cover almost his entire left buttock and the lower portion of the back of his left forearm. A cut or gash, approximately 2 inches long, appears on his lower back, near the base of his spine. He said that the gash was caused by Mr. Barr hitting him with the bat and that the bruises on his forearm and buttocks resulted from his being run over by Ms. Ware.

Mr. Steadman identified Defendant's Exhibit No. 3, another photograph. He was unsure about the details of that exhibit.

Defendant's Exhibit No. 4 is a photograph of Mr. Steadman's face. In the photograph, his right eye is blackened and there are two purple bruises on the right side of his face. He said that the black eye and bruises were caused by Mr. Barr hitting him in the jaw with the bat.

Defendant's Exhibit No. 6 is a photograph of the front side of Mr. Steadman's left forearm, which bears a gash about two inches long and a scrape by his elbow. He said that the gash was caused by Mr. Barr hitting him with the bat and that the scrape resulted from his being run over by Ms. Ware.

Mr. Steadman did not say that he either sought or required any medical attention or treatment for the injuries he purportedly received while at the Barrs'.

### d. Ms. Ware's Testimony

Ms. Casey Michelle Ware is Mr. Steadman's daughter. Ms. Ware testified that on July 2, 2001, the day of the incident, she and her father visited Smith Lake Park. She was 16 years old at the time.

Ms. Ware said that her father stopped sometime during that day at a convenience store and bought beer. She thinks that during the course of the day her

father consumed all of the beer he purchased at the convenience store. But she said that she did not actually see him drink any alcohol that day.[7]

Ms. Ware testified that they left the park abound 5:00 p.m. and her father drove to the Barrs'. It was not her idea to go there; it was his.

Ms. Ware testified that her father did not drive in an improper or erratic manner. When he arrived at the street in front of the Barrs' house, her father drove past the house looking for John, but did not see him. So he drove the truck to the end of the road, turned around, and drove back by the Barrs' house. On the second pass they saw John standing outside the front door of the Barrs'. When her father saw John he stopped the truck, got out, and hollered, "Hey, I heard you want to kill me," or something like that. Transcript at 74. John then went into the house.

According to Ms. Ware, the truck was parked on the right hand side of the road, in the lane opposite the front edge of the Barrs' yard. Her father was standing in the street. She said that John came back outside with a bat and walked to a point a little past the middle of the yard. John and Mr. Steadman were arguing. Mr. and Mrs. Barr were still inside the house.

As explained earlier, that testimony directly conflicts Mr. Steadman's testimony on the point. Mr. Steadman said that John went inside, where he remained for a period of time while Mr. Barr came out alone, got the bat from the garage and approached him, and that it was Mr. Barr, not John, with whom he argued.

Ms. Ware said that Mr. Barr came out next, but she does not remember where he went afterwards.

Mr. Steadman testified to the opposite. He said that Mr. Barr came out well before John, that he and Mr. Barr thereafter remained engaged virtually the entire time he was at the Barrs' residence, and that John, "eventually come back out." Transcript at 209.

According to Ms. Ware, Mrs. Barr eventually came out of the house, announced that she had called the police and began yelling derogatory things at her. Ms. Ware was still seated in the passenger's seat of the truck. She testified that Mrs. Barr was insulting her and called her a "whore." Transcript at 88.

---

[7] Ms. Ware must be mistaken in her testimony on that point. Mr. Steadman specifically admitted that he drank four beers after he and Ms. Ware left the park, and that he proceeded directly from the park to the Barrs' residence. He drove while Ms. Ware sat in the passenger's seat of the truck.

Case 04-00032-TOM    Doc 24    Filed 09/28/05    Entered 09/28/05 12:42:28    Desc Main
Document    Page 19 of 47

Again, Mr. Steadman's testimony differs from Ms. Ware's. When asked what Mrs. Barr said when she exited the house, he replied, "That the police were on their way." Transcript at 211. Then, according to him, he immediately told Ms. Ware, "to crank the truck up and ease down the street." Transcript at 211. He made no mention of any other words being spoken by Mrs. Barr until she purportedly stepped in front of the truck and said, "No, you are not going anywhere." Transcript at 211. Indeed, the sequence of events as related by Mr. Steadman left no interval during which Mrs. Barr could have berated or insulted Ms. Ware.

But according to Ms. Ware, Mrs. Barr gradually made her way into the road, stopping on occasion to talk, "like stop, talk, walk, stop, talk, walk." Transcript at 88. In the meantime, Mr. Steadman had moved in front of the truck. Once there, he said to Ms. Ware, "Get over, crank the truck and let's go." Transcript at 89. She did not, however, comply with his command because "[e]verybody was in front of the truck," including her father and Mr. Barr, but not, at that time, Mrs. Barr. Transcript at 89.

Ms. Ware testified that Mr. Steadman then repeated his command for her to move the truck. She denies that he told her to "stomp it." But he undisputably told her to move the truck. She testified:

> Q.    Nevertheless he directed you to move the vehicle, correct?
> A.    Yes, sir.
> Q.    There is no dispute about that, is there?
> A.    No, sir.

Transcript at 76.

Ms. Ware said that, when Mr. Steadman told her to move the truck the second time, he and Mr. Barr were still in front of the truck, John was to the left of the truck, and Mrs. Barr, "was diagonal in front of the truck." Transcript at 90.

Again, Ms. Ware's testimony is at odds with her father's. Mr. Steadman said that he and Mrs. Barr were standing in front of the truck when Ms. Ware moved it forward. He did not say that Mr. Barr was in front of the truck. He also flatly denied telling Ms. Ware twice to move the truck, and testified that Ms. Ware moved the truck the first and only time that he told her to move it.

Ms. Ware testified that she complied with her father's second command for her to move the truck, albeit against her wishes. She said that she did not want to move the truck because people were standing in front of it, and only moved it because her father expressly commanded her to do so. She testified:

> Q.    Okay. You didn't want to move this automobile when your father
>        told you to, did you?
> A.    Not at the time, no.

20

Q.      All right.  And you only moved it because he told you to; isn't that correct?

A.      Yes, sir.

Q.      But for him telling you to, this vehicle would not have moved; am I right?

A.      Yes.

Transcript at 78-79.

Ms. Ware said that, in compliance with her father's second command, she cranked the truck, put it in drive, and pressed the truck's accelerator.  As the truck began to move forward, Mrs. Barr, "ran out in front of the truck and told [Ms. Ware that she] wasn't going anywhere."  Transcript at 90 (parenthetical added).

Ms. Ware said that, at that moment in time, she had no idea where her father was and did not know where Mr. Barr was.  She testified:

Q.      Where was your father at that time?

A.      I have no idea.

Q.      Do you know where Mr. Barr was?

A.      No, sir.

Transcript at 90.

Again, there is a conflict between Ms. Ware's testimony and Mr. Steadman's. He said that he was standing directly in front of the truck when Ms. Ware floored the accelerator and that he ended up under the front of the truck after he was hit.  Ms. Ware, however, said that she did not know where her father was when she "floored" the accelerator and Mrs. Barr purportedly ran in front of the truck.  And since she must have been staring out the front window of the truck at that moment, it stands to reason that her father could not have been standing in front of the truck when she floored the accelerator because if he had been, she would have seen him.  And if Mr. Steadman was not standing in front of the truck when Ms. Ware floored the accelerator, he could not have been hit by the truck.

Ms. Ware said that she had no intention of "flooring" or "stomping" the accelerator, but that, as a matter of pure coincidence, when Mrs. Barr ran in front of the truck, the strap between the toes on her right flip-flop broke causing her foot to slip and depress the accelerator all the way to the floorboard of the truck.  In other words, although she "floored" the accelerator, it was unintentional.  She testified:

Q.      What occurred after you say that she came out – describe exactly what she did when she came out and told you that you weren't going anywhere?

21

A.     I cranked the truck up, I put it in drive and, when I started to go off, you're not going anywhere and ran out in front of the truck.

Q.     All right. And what did you do at that time?

A.     That is when I floored it with my shoe when it broke.

Q.     What kind of shoes did you have on?

A.     I had these pink flip-flops about that thick and a little ribbon that goes between your toes.

Q.     And what part broke?

A.     The one that goes between your toes and it broke and my foot went sideways.

Q.     All right. When it went sideways, did it come off of the shoe?

A.     I don't remember.

Q.     Well, what actually pushed the accelerator down? Was that your shoe or your foot?

A.     I think it was my foot.

Q.     Is that when you say the shoe turned over on the side and your foot slipped off of it?

A.     My foot slipped off and hit the gas pedal.

Q.     Was there ever any time that your father told you to stomp it?

A.     No, sir.

Q.     Were the words that he used anything other than what you have testified, move over and let's get out of here?

A.     That is all he said, yes, sir.

Q.     When your foot slipped off of the shoe and hit the accelerator, is that when you hit Ms. Barr?

A.     Yes, sir.

Q.     And where was your father at that time?

A.     I have no idea.

....

Q.     But you did floor it, though, didn't you?

A.     By accident, yes.

Q.     By accident you are saying you floored it, okay, but you floored it nevertheless, right?

A.     Sure, yeah.

Q.     You put the pedal to the metal, had the accelerator all of the way down?

A.     No, the accelerator did not – I didn't floor it on purpose. My shoe broke. I had on big shoes that broke. I didn't floor it all of the way to the floor; it just floored it for a couple of seconds.

Q.     Well, in your deposition you said you floored it, right?

A.     I don't think I said that.

Q.     Well, do you want me to show it to you?

A.     I may have told you that my shoe broke and it caused me to floor it but I didn't floor it intentionally.

22

Q.  Okay.  You are saying that you did floor it, you did hit the accelerator and you hit it hard, all of the way down, but you didn't do so intentionally?

A.  No.

Q.  Am I saying that wrong?

A.  No, that is fine.

Q.  Are we in agreement?

A.  Yes.

Q.  I mean you used the words in your deposition that you floored it and, if I am wrong about that, I will get it out for you?

A.  Well, I was going and then it got floored.  It was not like I floored it all immediately.

Transcript at 90-92; 77-78.

Ms. Ware's implication is that the truck was not moving nearly fast enough to injure Mrs. Barr before the strap on her flip-flop broke, and after the strap broke causing her to press the accelerator to the floorboard, the truck was moving fast enough to injure Mrs. Barr.  Ergo, Mrs. Barr's injury resulted not from Ms. Ware's movement of the truck per se, or even from Mrs. Barr's running in front of the truck, but instead from the breaking of the strap, which caused the depression of the accelerator, which caused the truck to move forward in a rapid and unexpected manner and strike Mrs. Barr.

Common sense dictates that if Ms. Ware pressed the accelerator with sufficient force to break the strap on her shoe then that same amount of force would have been sufficient to depress the accelerator far enough to generate the speed required for the truck to cause the injuries suffered by Mrs. Barr.  Conversely, if Ms. Ware was gently applying pressure to the accelerator, sufficient only to "ease" the truck down the road, as she implied that she was doing, the force would have been insufficient to break the strap on her flip-flop.  It likewise would have been insufficient to cause her foot to slip even if the strap actually broke.  And it would also, even if the strap actually broke, have been insufficient to force the accelerator to the floor.

Moreover, it is improbable that Ms. Ware's flip-flop strap could have broken as a result of her gently pressing her foot downward, flat against the sole of the flip-flop.  It is furthermore improbable that her foot could have slipped off the flip-flop to one side or the other or that, even if her foot had slipped, it would have depressed the accelerator with greater force than that which Ms. Ware was already applying.  All this leads to one probable conclusion , a conclusion that is more probable than that offered by Ms. Ware.  That conclusion is, in order for the accelerator to have been pressed to the floor, Ms. Ware intentionally pressed it with the force necessary.

And, as indicated before, Ms. Ware testified that she saw Mrs. Barr standing, "diagonal in front of the truck," when she placed it in motion, and that she saw Mrs. Barr run to a point that was a little closer to the front of the truck just before she floored the

23

accelerator. Consequently, the conclusion is unavoidable that Ms. Ware intended to run over Mrs. Barr because she undoubtedly knew that was exactly what the consequences of her intentional action of flooring the accelerator would be while Mrs. Barr was in front of the truck.

Ms. Ware said that she stopped the truck after it hit Mrs. Barr. She did not say how far the truck traveled after Mrs. Barr was hit. When she stopped the truck, it was sitting on top of Mrs. Barr's left leg. Mr. Barr and John ran up to the truck and told her to back it up and get it off of Mrs. Barr.

Ms. Ware testified that she complied with that command. She put the truck in reverse, moved it backwards off of Mrs. Barr's leg, put it in park, and got out. She did not say how far she backed the truck before she parked it.

She said that when she got out of the truck, she observed her father attempting to remove himself from beneath the truck. She testified:

Q.   All right. When you got out, did you see your father?
A.   Yeah, that is when he was getting out from under the truck and that
     was when they started hitting him.

Transcript at 93.

Ms. Ware's testimony that she saw Mr. Steadman "getting out from under the truck," and from that observation concluded that she had run over him, is entirely inconsistent with her testimony that she did not see him standing in front of the truck the moment before she floored the accelerator. Also, as discussed before, the fact that Mr. Steadman received no injuries to speak of as a result of allegedly being hit by the truck totally precludes the conclusion that he was in fact struck by the truck. It also refutes Ms. Ware's testimony that she saw him getting out from under the truck and her conclusion that she had struck him in addition to Mrs. Barr.

Moreover, Ms. Ware's testimony, that, after backing the truck off of Mrs. Barr and getting out, she saw Mr. Steadman coming from under the truck, is incongruous. When she backed the truck off of Mrs. Barr, if Mr. Steadman were under the truck, she necessarily backed it off of him at the same time. Consequently, it would have been impossible for her to have actually seen him coming out from under the truck as he would not have been under the truck when she got out of the truck.

Furthermore, Ms. Ware's testimony, that, after backing the truck off of Mrs. Barr and getting out, she saw Mr. Steadman coming from under the truck conflicts with her father's testimony. He testified that she was still in the truck when he came from beneath it and stood up. And that conflicts with Ms. Ware's testimony that while Mr. Steadman was attempting to stand up, Mr. Barr and John, "started hitting him." Transcript at 93.

Regarding the events which occurred after Ms. Ware backed up the truck, Ms. Ware's testimony again diverges from Mr. Steadman's. Ms. Ware specifically testified that when Mr. Barr and John began hitting her father she had already backed the truck off of Mrs. Barr and was standing outside of the truck. Her father was still on the ground. Mr. Steadman, however, testified that when Mr. Barr and John began hitting him, he had already moved from beneath the truck, stood up, and was looking down at Mrs. Barr. Mrs. Barr was still trapped under the truck's front wheel. Ms. Ware was still sitting in the truck. Mr. Steadman testified:

> Q.  Where were you when you were hit the first time?
> A.  I was standing in front of the truck looking down at Ms. Barr's leg.
> Q.  And is that the time that you were hit on the cheek in that exhibit?
> A.  Yes.
> Q.  And when you were hit there, did that knock you down to the ground or did you remain standing?
> A.  I think it – I don't really remember if it knocked me down or not. I remember ending up on the ground.
> Q.  Now where was Ms. Ware at that time? Was she still in the truck?
> A.  Yes.

Transcript at 218-19.

Ms. Ware said that Mr. Steadman eventually got back into the driver's seat of the truck. She got in the passenger seat and Mr. Steadman drove the truck from the Barrs' residence. A short while later, they were stopped by the police who were traveling from the opposite direction. The police arrested Mr. Steadman and put him, and Ms. Ware as well, in the police car and took them both to the police station.

Ms. Ware testified that her father never went into the Barrs' yard or driveway. She said that he never walked toward the Barrs' front door and that Mr. Barr never told her that she should stop her father from going toward the front door. She said that while he was at the Barrs' residence her father did not walk, talk, or act in a manner that might suggest that he was under the influence of alcohol.

Ms. Ware said that she never heard her father say that he was going to kill anyone. She admitted, however, that, during the time she and her father were at the Barrs' residence, she could not hear what he or anyone else was saying. She testified:

> Q.  Okay. Did you hear threats out there, going back prior to Ms. Barr being run over; did you hear threats, verbal threats coming from any of the people out there, Mr. Steadman, Mr. Barr, Charles?
> A.  You couldn't really tell what anybody was saying.

Transcript at 82.

## B.  Applicable Law

### 1.  Section 523(a)(6)

Section 523(a)(6) of the Bankruptcy Code makes nondischargeable a debt for any "willful and malicious" injury caused by a debtor to another person.  The definitions of those two particular terms of art have long been established and recognized in this Circuit.  An early explanation is:

> In order that a provable liability come within this exception the injuries must have been both willful and malicious.  An injury to person or property may be a malicious injury within this provision if it was wrongful and without just cause or excuse, even in the absence of personal hate, spite or ill will.  The word "willful" means nothing more than intentionally doing an act which necessarily leads to injury.  Therefore, a wrongful act done intentionally, which necessarily produces harm and is without just cause or excuse, may constitute a willful and malicious injury.

In re Vickers, 546 F.2d 1149, 1150 (5th Cir. 1977).[8]

Moreover, the Supreme Court of the United States has clarified those accepted definitions by reiterating and reemphasizing that nondischargeability under section 523(a)(6) requires, "a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury."  Kawaauhau v. Geiger, 523 U.S. 57, 61 (1998).  Reckless, wanton, or negligent acts will not suffice.  The debtor must have actually intended, "'the consequences of an act,' [i.e., the injury] not simply 'the act itself.'"  Id. at 61-62 (quoting Restatement (Second) of Torts § 8A, comment a, p. 15 (1964)).

### 2.  Burden of Proof

The burden on Mrs. Barr in this proceeding was to prove by a preponderance of the evidence that she was willfully and maliciously injured by Mr. Steadman.  Grogan v. Garner, 498 U.S. 279, 291 (1991).  By definition, "The burden of showing something by a 'preponderance of the evidence,' the most common standard in the civil law, 'simply requires the trier of fact "to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the [judge] of the fact's existence."'"  Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for So. Cal., 508 U.S. 602, 622 (1993)(quoting In re Winship, 397 U.S. 358, 371-372 (1970)(brackets in original)(citation omitted)).  In addition,

---

[8] See also In re Walker, 48 F.2d 1161, 1164 (11th Cir. 1995);  In re Ikner, 883 F.2d 986, 991 (11th Cir. 1989); In re Latch, 820 F.2d 1163, 1166 n.4 (11th Cir. 1987); In re Dardar, 620 F.2d 39, 40 (5th Cir. 1980).

"Before any such burden can be satisfied in the first instance, the factfinder must evaluate the raw evidence, finding it to be sufficiently reliable and sufficiently probative to demonstrate the truth of the asserted proposition with the requisite degree of certainty." Id. at 622.

### 3. Principal

It is of no consequence that Mr. Steadman was not operating the vehicle when it hit Mrs. Barr. If he instructed Ms. Ware to drive the truck into Mrs. Barr, and Ms. Ware complied with that instruction by intentionally hitting Mrs. Barr with the truck, then he is equally as guilty of the misdeed as Ms. Ware. And Mrs. Barr is entitled to recover against him for the resulting injuries and damages, and, furthermore, to a determination that the debt which encompasses said injuries and damages is nondischargeable. "[T]he law looks upon such a conspirator, or one who is ready to aid, as an actual participant in the completed offense. That is, he is considered a principal (as the statute states)." Ex parte Williams, 383 So.2d 564, 565 (Ala. 1980). "'There can be no such thing as an innocent agency in the commission of a tort; and doing an illegal or tortious act by another, is doing it by one's self.'" Stapler v. Parler, 212 Ala. 644, 103 So. 573 (1925)(quoting Ala. Mid. R.R. Co. v. Coskry, 92 Ala. 254, 9 So. 202 (1891)).

"[O]ne who is present, encouraging, aiding, abetting, or assisting, or who is ready to aid, abet, or assist, the active perpetrator in the commission of the offense, is a guilty participant, and in the eye of the law is equally guilty with the one who does the act." Tanner v. State, 92 Ala. 1, 9 So. 613, 615 (1891)(in a separate trial of one jointly indicted with others for assault with intent to murder, where there was evidence that all of the assailants acted with a common purpose to commit the assault, instructions were properly refused which were based upon the theory that the defendant on trial could not be convicted unless he actually did the acts constituting the assault). "[A]s a general rule, the act of one becomes the act of all, and the one who encourages, or stands ready to assist, is alike guilty with the one who perpetrates the violence." Id. Mangino v. Todd, 19 Ala. App. 486, 491, 98 So. 323, 328 (1923)(in civil suit for assault and battery against three deputy sheriffs who made an unauthorized effort to stop a buggy during which one of the occupants of the buggy was shot by one of the officers, all three officers were equally responsible because "[t]hey were all engaged upon a common enterprise or adventure which contemplated the halting of the buggy and its occupants," and, "were present, encouraging, aiding, and abetting each other in this enterprise.").

### C. Conclusions on Liability and Dischargeability

The testimony from Mr. Barr and Mrs. Barr establishes that:

1. Using the paint pole, Mr. Steadman intentionally herded Mrs. Barr in front of his truck, and, at that point, told Ms. Ware to "stomp it," which she did, causing the truck to hit Mrs. Barr and run over her leg;

27

2.  Mr. Steadman blocked Mrs. Barr's escape by striking her with the pole as she attempted to turn away from and flee the oncoming vehicle; and,

3.  Mr. Steadman assaulted Mr. Barr several consecutive times with the pole as Mr. Barr attempted to rescue Mrs. Barr.

Mr. Steadman's malicious intent is amply demonstrated by those facts, as well as these:

1.  He went to the Barrs' residence uninvited, unannounced, and inebriated, for the sole purpose of having a "confrontation" with Mr. and Mrs. Barrs' minor son;

2.  He instigated the difficulties by saying to John, "Hey, I heard you wanted to kill me;" he armed himself with a paint scraper when he got out of his truck; he told Mr. Barr that he had come there to kill John and that he would kill Mr. Barr also; he swung the pole back and forth at John and Mrs. Barr in a manner that forced them into the street in the area in front of his truck; he told the Barrs that he was not leaving until he had killed them all; once John and Mrs. Barr were in front of the truck, he commanded his minor daughter to "floor" the accelerator; and when Ms. Ware refused to obey his first command, he repeated it.

The Court finds no reason to doubt the accuracy of either of the Barrs' testimony. The facts testified to by Mrs. Barr are in all salient respects consistent with the facts testified to by Mr. Barr, and vice versa. Neither's testimony contains any salient internal inconsistencies or incongruencies, and neither testified to anything that seems implausible or impossible on its face, from a common sense perspective or from general knowledge.

By contrast, there is ample reason to doubt the accuracy of the testimony from Mr. Steadman and Ms. Ware. The facts testified to by Mr. Steadman are in many salient respects inconsistent with the facts testified to by Ms. Ware, and vice versa. Those are:

1.  Ms. Ware testified that she did not actually see her father consume any alcoholic beverages that day. Mr. Steadman, however, specifically admitted that he drank four beers after he and Ms. Ware left the park. During that time, he was driving the truck and Ms. Ware was sitting in the passenger's seat. It would, therefore, have been virtually impossible for Ms. Ware not to have seen her father consume those four beers. Consequently, either Ms. Ware or Mr. Steadman is mistaken. Either Ms. Ware saw her father drink the beers or Mr. Steadman did not drink any beer after leaving the park.

28

2.  Mr. Steadman testified that after he first called to John, John went inside; that when John went in, Mr. Barr came out, retrieved the bat from the garage and approached him; that he and Mr. Barr, not John, began to argue; and that John did not come out of the house until later.  Ms. Ware, however, testified that after John went inside, he quickly came back with the bat in his hands and approached her father; that it was John, and not Mr. Barr, with whom her father argued; and that Mr. Barr did not come out of the house until after John.

3.  Ms. Ware testified that when Mrs. Barr eventually came out of the house, she announced that she had called the police and began yelling derogatory things at Ms. Ware, and calling her insulting names.  However, Mr. Steadman testified that the only thing Mrs. Barr said when she exited the house was that the police were on their way. He did not mention any other words being spoken by Mrs. Barr until she purportedly stepped in front of the truck and said, "No, you are not going anywhere."  Transcript at 211.

4.  Mr. Steadman testified that he and Mrs. Barr were standing in front of the truck when Ms. Ware caused it to move forward.  He did not say that Mr. Barr was in front of the truck.  And he said that he told Ms. Ware only once to move the truck, and that Ms. Ware moved the truck in response to the first and only command he gave her to move it.  Ms. Ware, however, testified that her father told her twice to move the truck; that she did not comply with his initial directive to move the truck because her father and Mr. Barr were standing directly in front of it at the time; that when he told her to move the truck the second time she complied; and that when she started the truck forward in response to her father's second directive she did not know where he or Mr. Barr were standing.

5.  Mr. Steadman testified that he was standing directly in front of the truck when Ms. Ware "floored" the accelerator and that he ended up under the front of the truck after it hit him.  Ms. Ware, however, said that she did not know where her father was when she "floored" the accelerator.  Since she was staring out the front window of the truck at that moment, it stands to reason that her father could not have been standing in front of the truck when she "floored" the accelerator because if he had been she would have seen him.  And if Mr. Steadman was not standing in front of the truck when Ms. Ware "floored" the accelerator, he could not have been hit by the truck.

6.  Mr. Steadman did not testify that Ms. Ware immediately backed the truck off Mrs. Barr's leg, or that Mr. Barr attacked him after the truck was moved.  To the contrary, he testified that, when Mr. Barr and John began hitting him, he had already removed himself from beneath the truck and stood up; that he was standing and looking down at Mrs. Barr, who was still trapped under the truck's front wheel; and that Ms. Ware was still sitting in the truck.  Ms. Ware, on the other hand, testified that when she stopped the truck, Mr. Barr and John told her to back it up and get it off of Mrs. Barr; that, in response to that command, she put the truck in reverse, moved it backwards off Mrs. Barr's leg, put it in park, and got out; that Mr. Barr and John did not begin hitting

29

her father until after they had asked her to back the truck up, and after she had backed the truck off of Mrs. Barr, and after she had exited the truck; and that her father was still on the ground when he was allegedly attacked by Mr. Barr and John.

Furthermore, both Mr. Steadman's testimony and Ms. Ware's testimony contain salient internal inconsistencies and are fraught with incongruence. Those are:

1. In his deposition, Mr. Steadman testified that he was under the influence of alcohol when the events occurred. However, at trial he insisted that he was not influenced by the alcoholic beverages he consumed prior to going to the Barrs' residence. Not only is Mr. Steadman's trial testimony inconsistent with his deposition testimony, it also is incongruent with his guilty plea to driving under the influence.

2. At trial, Mr. Steadman first insisted that he had consumed only four beers and two or three ounces of whiskey at some point during the day prior to arriving at the Barrs'. In his deposition, however, he testified that, prior to going to the Barrs', he had actually consumed six beers and an entire half-pint of liquor. And later in his trial testimony, he admitted to consuming six beers, two before going into the park and four after leaving the park.

3. At one point Mr. Steadman testified that his truck was parked in the middle of the road and that he essentially stood within a couple of feet of the truck the entire time he was at the Barrs' residence. In another part of his testimony, he testified that the truck was parked on the, "opposite side of the road," and that upon getting out of his truck he proceeded to a point in the street next to the Barrs' driveway.

4. Mr. Steadman first testified that he was unarmed when Mr. Barr approached him. But he later admitted that he was holding a paint scraper in his hand.

5. At one point Mr. Steadman testified that he could not recall either what Mr. Barr said to him or what he said to Mr. Barr during their conversation. At another point in his testimony, he said that Mr. Barr told him that he was going to beat him up, or hit him with the bat, or words to that effect.

6. Ms. Ware testified that when she got out of the truck she saw her father attempting to remove himself from under the truck, which was the time she purportedly first realized that she had run over her father in addition to Mrs. Barr. That testimony is entirely inconsistent with her testimony that she did not see Mr. Steadman standing in front of the truck the moment before she floored the accelerator. It is furthermore incongruous. When she backed the truck off Mrs. Barr, if Mr. Steadman had been under the truck, she necessarily backed it off him as well. Consequently, it would have been impossible for her to have seen him getting out from under the truck as he would not have been under the truck at that time.

7.  Mr. Steadman testified that he was attempting to leave the Barrs' from the moment he was confronted by Mr. Barr, and that his decision to leave was motivated in part by Mr. Barr's aggressive actions.  That explanation is, of course, completely incongruous.  He testified that he saw Mr. Barr retrieve the bat from his basement when he was standing in the street by the truck.  At that point in time, he had ample opportunity to leave.  Instead, he armed himself with the paint pole and proceeded to wait for Mr. Barr to walk down the driveway into the street.  It is apparent from those actions that Mr. Steadman was not afraid of Mr. Barr and had no intention of leaving.  Furthermore, the fact that Mr. Steadman proceeded to the front of the truck, instead of entering the truck through the driver's side door, which would have been the quickest route, also belies his suggestion that he was attempting to escape from Mr. Barr and demonstrates a desire to continue the confrontation he initiated.

8.  Mr. Steadman testified that while standing at the center of the truck's hood, three feet from its front, he told Ms. Ware to move the truck down the street.  That testimony is not believable.  He most certainly would have been hit. Why would he tell Ms. Ware to move the truck when he knew that he would have been hit?

9.  Mr. Steadman's testimony is that Mr. Barr attacked him while Mrs. Barr's leg was still trapped under the truck and before Mr. Barr attempted to rescue his wife.  While Mr. Steadman's transgression against Mrs. Barr may have caused an angry response from Mr. Barr, the Court cannot believe that Mr. Barr would have taken that action before he attended to his wife.

Both Mr. Steadman and Ms. Ware testified to things which appear implausible or impossible in light of common sense and general knowledge.  Those are:

1.  Mr. Steadman testified that the only reason he testified in his deposition that he drank all six of the beers he purchased at the convenience store on the day of the instance was because he misunderstood the question, "'How much did you drink?'" Transcript at 182.  He testified that the only reason he testified in his deposition that he drank an entire half-pint bottle of liquor was because he misunderstood the question, "'And how much liquor did you drink?'" Transcript at 183.  And he testified that the only reason that he testified in his deposition that he was under the influence of alcohol during the time that he was at the Barrs' residence was because, in his opinion, "any consumption of alcohol is under the influence," even if it has no discernable effect on him, so that, even if he had only consumed one beer, he would have still said that he was "under the influence of alcohol."  Transcript at 176.  The three questions placed to Mr. Steadman at his deposition relating to his alcohol consumption prior to going to the Barrs' residence were simple and straightforward and could not have been posed to him in a more direct and elementary manner.  The Court must conclude that Mr. Steadman understood them and that his answers were responsive.

2.  Mr. Steadman testified that, other than a few superficial scratches and bruises, he was not injured from being run over by the truck.  Common sense and

31

general experience dictates that had Mr. Steadman actually been hit by the truck, at such short range, with the truck's accelerator pressed to the floorboard, he would, more probably than not, have been seriously injured. He would at least have incurred more than superficial scratches and bruises. Based on the improbability of Mr. Steadman's testimony, the Court must conclude that he was not hit by the truck. That conclusion agrees with the Barrs' testimony, and with Ms. Ware's statement that, when she "floored" the accelerator, she did not know her father's location.

3. Ms. Ware testified that she had no intention of "flooring" or "stomping" the accelerator, but that, as a matter of pure coincidence, when Mrs. Barr ran in front of the truck, the strap between her toes on her right flip-flop broke causing her foot to slip and to depress the accelerator all the way to the floor board of the truck. As discussed above, as a matter of general experience and common sense, the Court cannot imagine how Ms. Ware's application of <u>gentle pressure</u> to the accelerator could have possibly resulted in the strap on her shoe breaking, or how the strap breaking could have resulted in her application of greater force to the accelerator than what she was already applying. And Ms. Ware did not explain why she simply did not remove her foot from the accelerator when the strap broke, that is raise her foot and place it on the brake or apply the brake with her other foot when she allegedly saw Mrs. Barr rush in front of the truck. Based on the improbability of Ms. Ware's testimony, the Court must conclude that she intentionally pressed the accelerator to the floor in accordance with her father's instructions. That conclusion agrees with the Barrs' rendition of the events.

In evaluating the reliability of Mr. Steadman's testimony, the Court must recognize that more probably than not, Mr. Steadman's abilities to accurately perceive and retain the events that occurred at the Barrs' residence were impaired by the effects of the alcohol he consumed. He admitted in his deposition to having consumed a six-pack of beer and a half-pint of liquor. He admitted in his deposition that he was under the influence of alcohol while he was at the Barrs' residence. He pled guilty to driving under the influence of alcohol when he left the Barrs' residence. And both of the Barrs said that, in their opinions, Mr. Steadman was intoxicated. Based on those ample facts, the Court must conclude that Mr. Barr was inebriated to some degree while he was at the Barrs' residence. Therefore, more likely than not, Mr. Steadman's rendition of what transpired at the Barrs' residence is inaccurate and, consequently, unreliable.

Similarly, in evaluating the reliability of Ms. Ware's testimony, it cannot be forgotten that she was only 16 years old. Given her youth and inexperience, the Court must consider the real possibility that the accuracy of Ms. Ware's perception of the disturbing and traumatic events which occurred on that occasion may have been clouded by the overwhelming emotions, including fear, anger, nervousness, and excitement, that those events naturally must have inspired in her.

In any event, Ms. Ware's testimony does not absolve Mr. Steadman. To the contrary, she testified he told her once to move the truck while people were standing in front of it and that she refused to obey his command because those people would have

32

been hit by the truck had she complied. When she did not comply with his first command, Mr. Steadman apparently sensed Ms. Ware's reason for apprehension, and, in spite of that, commanded her to move the truck a second time. And Ms. Ware said that when her father commanded her to move the truck the second time, she again was reluctant to comply because people were still standing in front of it, including Mrs. Barr, who, she testified, "was diagonal in front of the truck." Transcript at 90. <u>By telling Ms. Ware a second time to floor the accelerator while Mrs. Barr was standing "diagonal in front of" it, Mr. Steadman once again clearly made his desires know, that is for Mrs. Barr to be struck by the truck</u>.

And finally, the Court must conclude that the Barrs' rendition of the incident is, more probably than not, what actually happened. And that is consistent with Mr. Steadman's overall conduct. Mr. Steadman went to the Barrs' residence uninvited, unannounced, and for the express purpose of causing trouble or engaging in behavior that was certain to result in an altercation. Once he arrived, Mr. Steadman did not calmly walk to the front door and ring the doorbell. He did not ask for John's parents for the purpose of gaining permission to speak with their minor son or allowing them the opportunity to be present during that conversation. Instead, he shouted at John directly from the street, his words in the form of a challenge, specifically using the word "kill," which was <u>certain</u>, as he well knew or should have known, to raise the ire and apprehension of John and his parents once they became aware of his presence. He had been drinking, and was probably inebriated, which was likely to arouse an even greater level of apprehension in the minds of the Barrs. When he got out of the truck, he armed himself with a paint scraper, a metal device with pointed edges which can readily be used to cause bodily harm to another person, thus evincing his intent to engage in a physical altercation.

Mr. Steadman did not leave the Barrs' residence despite having ample opportunity to do so. His apparent intent was to remain until his goal was accomplished. He told Ms. Ware to move the truck while people were standing in front of it, thus evincing his intention that one of the Barrs be hit by the truck, exactly what happened. Thus, he did not leave the Barrs' residence until he had accomplished what was apparently his purpose.

These facts are fully consistent with the Barrs' characterization of how the events transpired, furthermore, entirely consonant with the conclusion that Mr. Steadman willfully and maliciously injured Mrs. Barr.

In summary, the testimonies by Mr. and Mrs. Barr are eminently more credible, reliable, believable, and plausible than the competing testimonies given by Mr. Steadman and Ms. Ware. It is, therefore, more probable than not that the testimonies given by Mr. and Mrs. Barr accurately depict the events that occurred on July 2, 2001, when Mr. Steadman came unannounced and uninvited to their residence. Furthermore, the Barrs' depiction of those events are generally consistent with what actually happened that day according to all of the witnesses. It is also consistent with Ms.

Ware's admission that her father told her twice to move the truck while people were in front of it and that she indeed "floored" the accelerator, albeit, according to her, accidentally, just like, according to the Barrs, her father had told her twice to do. Based on the Barrs' depiction of those events, the Court must conclude that, more probably than not, Mr. Steadman willfully and maliciously injured Mrs. Barr. Specifically, the Court finds:

(1) Mr. Steadman intentionally herded Mrs. Barr in front of the truck with the pole.

(2) Once he forced Mrs. Barr to a position in front of the truck, he told Ms. Ware to move over into the driver's seat, crank the truck, and "floor" or "stomp" the accelerator with knowledge and intention that when she did it would result in Mrs. Barr being struck and injured by the truck.

(3) When Ms. Ware refused to obey his first command, Mr. Steadman told her again to "floor" or "stomp" the accelerator with knowledge and intention that when she did it would result in Mrs. Barr being struck and injured by the truck.

(4) Ms. Ware obeyed the second command by intentionally pressing the accelerator to the floor while Mrs. Barr was standing in front of the truck, with full knowledge and realization that Mrs. Barr was standing in front of the truck and would be hit and injured by the truck.

(5) Mr. Steadman thwarted Mrs. Barr's attempted escape from the truck by striking her with the pole.

(6) Mrs. Barr was struck and injured by the truck.

Mrs. Barr has established by a preponderance of the evidence that she was willfully and maliciously injured by Mr. Steadman. Therefore, the resulting debt owed by Mr. Steadman to her is nondischargeable by virtue of section 523(a)(6). The remaining question is what is the amount of that debt.[9]

_____

[9] Cowen v. Kennedy (In re Kennedy), 108 F.3d 1015, 1018 (9th Cir. 1997); Longo v. McLaren (In re McLaren), 3 F.3d 958, 965-966 (6th Cir. 1993); Atassi v. Mclaren (In re McLaren), 990 F.2d 850, 853-854(6th Cir. 1993); N.I.S. Corp. v. Hallahan (In re Hallahan), 936 F.2d 1496, 1507-1508 (7th Cir. 1991); Vickers v. Home Indem. Co., Inc. (In re Vickers), 546 F.2d 1149, 1151 (5th Cir. 1977).

Case 04-00032-TOM     Doc 24     Filed 09/28/05     Entered 09/28/05 12:42:28     Desc Main
Document      Page 34 of 47

## II.  DAMAGES

### A.  Evidence Regarding Mrs. Barr's Injuries and Damages

The determination of the appropriate amount to award Mrs. Barr for the injuries she suffered because of Mr. Steadman's malfeasance is problematic.  She did not present the Court with any breakdown or itemization of what, in her opinion, she is entitled to receive.  She did not suggest what amount, if any, she should receive for lost wages, either past or future; what amount she should be awarded for her pain and suffering; or what amount she should be awarded for her permanent, partial disability; or what amount she should be awarded for prospective medical expenses.  Nor did she offer any guidance to the Court to make those calculations.  Consequently, the Court is left on its own to fashion an appropriate monetary award.

### 1.  Mrs. Barr's Testimony

### a.  Injuries and Treatment

Mrs. Barr's left ankle and foot were trapped under the front left tire of the truck when she was hit.  Essentially, the flesh and skin on the outside of her left ankle, and the skin on the outside of her left leg, "disintegrated" through the action of the wheel grinding them against the asphalt.  Transcript at 25.  Needless to say, Mrs. Barr experienced excruciating pain during the time she was being dragged by the truck, as well as when the truck was sitting on her ankle and foot after it had stopped.  She described her feelings while she was trapped and while she waited for the ambulance after the truck had been backed off of her.  She testified, "[I] thought I was dying.  I mean it was awful ...."  Transcript at 22.

Mrs. Barr's principal injury was to her left ankle and foot.  However, she also received, "injuries to [her] arm, both thighs and [she] had a possible tail bone fracture." Transcript at 31 (parentheticals added).

Mrs. Barr was taken to the hospital by an ambulance.  She said that the ambulance technicians wrapped the open wound and administered an IV.  They had to slap her face in order to keep her from passing out.

Mrs. Barr remained in the hospital for 11 days.[10]  At the hospital, she underwent debridement surgery which involved cleaning the debris out of the open wound, a large hole in her ankle.  After the surgery, she had to go undergo a process twice a day for around four days which involved sitting in a vat of hot water soaking the open wound.

---

[10] Mrs. Barr testified that she was in the hospital 13 days.  As indicated before, however, her medical records reflect that she was in the hospital 11 days.

35

According to Mrs. Barr, the process was extremely painful. "That was very, very excruciating for that open wound to be put in that hot water." Transcript at 31.

On her fifth day in the hospital, she underwent more surgery, this time for a skin graft. The surgeon took the graft from the upper part of Mrs. Barr's left thigh and grafted the skin to her left ankle and foot.

After she was discharged from the hospital, according to her testimony, Mrs. Barr was completely bedridden for a month, during which time she could not walk or bathe. She periodically had to return to the doctor for him to dress the wound. She was required to use a walker after she was able to get out of bed. But she was not allowed to place any pressure on the skin graft. Consequently, she remained confined to the downstairs area of her house for around three months, because climbing the stairs would have required her to place pressure on the graft.

Mrs. Barr testified that although she eventually was able to negotiate the stairs, she had to continue using the walker for another month. After that, she was allowed to switch to crutches, which she used for about three weeks.

Mrs. Barr said that she was required to undergo physical therapy for her injuries on twenty to thirty occasions. The therapy often involved the application of electrical stimulation around her foot and ankle, which was designed to treat the extensive damage to the nerves. It also involved the therapist teaching her to use her foot again.

In September, 2001, Mrs. Barr came under the care of Dr. Dewey Jones, IV, an orthopedist, who became, and still remains, her primary provider of care for the injury to her ankle and foot. She said that she continues to require medical attention for the injury because she has, "permanent nerve damage and ... swelling and ... constant falls because [she] can't feel [her] foot." Transcript at 34 (parentheticals added). According to Mrs. Barr, she feels nothing in the top of her foot, and in side of her foot, and in four of her toes, during her waking hours. At night, however, the nerves in her left foot generate unpleasant sensations which prevent her from sleeping soundly. Transcript at 36-37.

Mrs. Barr testified that she has very limited range of motion in her left foot. She can move it only a little to the left and hardly any to the right. She has twice fallen and injured her right leg as a result of not being able to feel or to move her left foot.

Mrs. Barr has had a number of "MRI's" and other tests done on her left knee and foot. She suffers considerable swelling and a great deal of pain in her left knee.

According to her testimony, Mrs. Barr has incurred, and paid, $3,500 for related medical treatment not covered by insurance.

Case 04-00032-TOM    Doc 24    Filed 09/28/05    Entered 09/28/05 12:42:28    Desc Main
Document    Page 36 of 47

Mrs. Barr identified Plaintiff's Exhibits 4(a)(1), 4(a)(2), 4(a)(3), 4(a)(4) and 4(a)(5) as photographs of her injuries during various stages of her recovery.  Exhibit 4(a)(1) depicts Mrs. Barr in the hospital with her left leg extensively bandaged.  Exhibit 4(a)(2) shows the scarring and the skin graft.  Exhibit 4(a)(3) shows the skin graft immediately after it was completed.  Exhibit 4(a)(4) is a photograph of Mrs. Barr's left leg after "extensive healing."  Transcript at 25.  Exhibit 4(a)(5) is another photograph of Mrs. Barr's left leg, taken during one of the many visits that she made to the surgeon.

### b.  Disability and impairment

Mrs. Barr testified that she worked as a truck driver from 1984 until she was injured by Mr. Steadman, except for a short break in 1993 when she took several personal enrichment type courses at a community college.

She said that she worked for National Computer Print as a truck driver for a number of years until 1998.  Her annual salary at NCP was $21,000.00.  In 1999 she went to work for Georgia Pacific as a truck driver.  She earned $25,600.00 in 1999 and $27,957.00 in 2000 from Georgia Pacific.

Mrs. Barr testified that in November 2002, her doctor advised her that she could perform "light duty" work.  On that basis, she returned to work at Georgia Pacific.  But when there was no longer light duty to perform, her employer was forced to terminate her employment.

Ultimately, she found a job as a driver for Keebler Company.  But she was, according to her testimony, unable to perform the physical activities required to perform her job.  She could not climb, or sit for long periods of time, or lift very much, or walk very well, and had difficulty manipulating the clutch on her truck, all of which are essential activities required of a truck driver.  So she had to abandon the job at Keebler in September 2003.

In Mrs. Barr's judgment, her injuries will preclude her from ever being able to work as a truck driver again, the profession she enjoys and her preferred occupation.

Since leaving Keebler in September 2003, Mrs. Barr has not sought other employment.  She testified that she has not sought other employment because she cannot drive a truck, which is the only thing that she believes she is really qualified to do where she could earn enough to pay for day care and make a living.  She testified, "Well, the other type of work that is out there without a college degree, I can't make the amount of money to pay for child care.  I mean I can't make thirty thousand dollars at a convenience store."  Transcript at 195.

## 2. Mr. Barr's testimony

Mr. Barr and Mrs. Barr have been married for 20 years. Mr. Barr testified that since Mrs. Barr was injured she has been unable to do much lifting or walking. She has constant trouble with her back and her legs hurt and swell all of the time. She cannot walk around or do any exercise, which she was able to do, and was in the habit of doing, before she was injured. She has gained around 30 pounds. She is in pain all of the time and worries a lot. Sometime she cannot go to sleep for hours because her leg and foot are bothering her. Mrs. Barr's constant suffering has adversely effected their relationship:

> We get along. I am not saying that, but she has a lot of pain and a lot of suffering all of the time and a lot of worry, you know, and it is not the same as it was. I will have to say that, although I have looked over everything that I possibly can and will continue to because I love my wife, but there is a difference in our marriage since this happened.

Transcript at 151.

## 3. The Deposition of Dr. Dewey Jones, IV, and Mrs. Barr's Medical Records

Dr. Dewey Jones, IV, is a licensed physician and board certified in orthopedic surgery. His deposition was admitted into evidence without objection as Plaintiff's Exhibit 5. Dr. Jones has been treating Mrs. Barr for the injuries she received in the incident since September 14, 2001. Mrs. Barr was a patient of his for several months prior to receiving those injuries.

Attached to the deposition, and admitted into evidence, are medical records pertaining to Mrs. Barr's treatment. Those records include Dr. Jones' records; records from Carraway Methodist Medical Center, the hospital where Mrs. Barr was initially treated; records from Physiotherapy Associates, where she received her physical therapy; records from Brookwood Medical Center, where MRIs were conducted; records from Norwood Clinic, where she received follow up treatment after being released from Carraway; records from HealthSouth Sports Medicine and Rehabilitation Center, where she received a disability evaluation; and miscellaneous other records.

Mrs. Barr's medical records reflect that, on July 2, 2001, at around 4:52 p.m., she was transported by ambulance to Carraway Methodist Medical Center. The ambulance attendants noted that she had an abrasion on her left forearm and several abrasions along her left leg, from her knee to her ankle; that the flesh had been torn from the outside of her left ankle; and that the bone of her left ankle was exposed. Hospital emergency room records reflect that the flesh had been torn from Mrs. Barr's left ankle; there was road rash on the lower outside of her left leg, in the area from her knee to her ankle, and her left forearm; and that part of the bone of her left fibula was abraded.

38

Mrs. Barr underwent surgery on July 3, 2001. The surgeon who conducted the procedure was Dr. Edward Bromberg. Dr. Bromberg observed an open area on the outside of Mrs. Barr's left ankle where the flesh had been torn away. The lateral side of the ankle bone, the part that protrudes, or malleolus, was exposed, and the outside of the malleolus was missing, leaving the inside, cancellous part of the bone visible. A long linear break in the surface of Mrs. Barr's skin extended from her heel, through the malleolus, to her knee. Dr. Bromberg washed Mrs. Barr's wound with saline, removed the dead tissue and foreign matter from it, dressed it, and applied a splint.

Mrs. Barr underwent another surgery on July 10, 2001. It was conducted by Dr. Robert Howe, a plastic surgeon. Dr. Howe closed Mrs. Barr's left ankle wound by grafting skin, which he obtained from her upper left thigh.

Mrs. Barr was discharged from the hospital on July 13, 2001. During her stay, she was required to undergo, in addition to the two surgeries, constant medication, daily examinations, a number of whirlpool baths intended to make and keep her wounds clean, physical therapy, multiple applications of dressings to her wounds, and x-rays. Upon discharge, she was issued a walker to assist her in moving about until she regained full use of her left leg.

Dr. Howe monitored Mrs. Barr's progress following her discharge from the hospital. He examined her skin graft on approximately 10 occasions. He redressed the area, until November 12, 2001, when, according to his records, he determined that it had healed completely.

Mrs. Barr first consulted Dr. Dewey Jones, IV, with respect to the injury to her left ankle on September 14, 2001. On that occasion, Mrs. Barr reported that she was still experiencing pain in the area of her left ankle. Dr. Jones examined her left foot and determined that the nerves in the area of her injury were not functioning completely; that there was numbness in the area and the nerves, "could only tell things sort of light touch, but could not really discriminate completely." Dr. Jones' deposition, page 17. Mrs. Barr could, at the time, walk on the foot. Dr. Jones prescribed physical therapy for Mrs. Barr and determined that she was not yet able to return to work.

Mrs. Barr began physical therapy on September 18, 2001. From that date until October 24, 2001, she underwent physical therapy on approximately 8 occasions. The sessions included therapeutic procedures, electrical stimulus, and massage. It appears from the records of her physical therapist that Mrs. Barr made extraordinary progress during the course of her treatment and that her condition was promising. She reported walking up to two miles a day and riding a bike a similar distance and was apparently reporting no pain.

Mrs. Barr returned to Dr. Jones on October 26, 2001. At that time, Dr. Jones' impression was that she was doing excellent. She reported to him that she was cutting the grass at home and riding a bicycle at physical therapy. Although Dr. Jones' records

39

indicate that Mrs. Barr reported to him that she was experiencing numbness over the area of her skin graft and along the top of her left foot, the records do not indicate that she reported any pain. Dr. Jones determined that Mrs. Barr was ready to go back to regular work and noted on a form that she provided to him on that occasion that she was cleared to return to work on October 29, 2001, and to perform the regular duties required of her job, with no restrictions.

Dr. Jones' prognosis proved overly optimistic. Mrs. Barr returned to him on December 10, 2001. At that time, she reported aches and pain in her left leg, which radiated up and down her shin or tibia and into her knee. She said that her leg would generally get sore at night after she had been on it all day and often became sore after she had been sitting for awhile. During the examination, Dr. Jones could not, by manipulating Mrs. Barr's left ankle, elicit the pain that she complained of. His impression was that she may have had tendinitis and started her on anti-inflammatory medication.

Mrs. Barr returned to Dr. Jones on January 25, 2002. At that time, she again reported pain and burning sensations radiating from her left ankle to the back of her knee. She told him that the pain was especially bad at the end of the work day and in the evening. His examination revealed that Mrs. Barr appeared to have full functional range of motion in her left knee. But she experienced pain when the knee was rotated and was still experiencing decreased sensation on the top of her left foot. His impression was that the pain was probably a residue of the injury to her left ankle and that it was going to be very difficult to discern the precise source of the pain. Nonetheless, he directed that a MRI be performed on her knee, in order to rule out any other possible causes.

The MRI uncovered no other possible sources of Mrs. Barr's discomfort. Dr. Jones examined Mrs. Barr again on February 22, 2002. Once again she reported the pain in her left leg and that her activities were being curtailed as a result of the pain. At that point, it is apparent that Dr. Jones was at a loss concerning the precise source of the pain, and, consequently, referred Mrs. Barr to one of his associates, Dr. Dewey Jones, III, for a second opinion.

Dr. Jones, III, examined Mrs. Barr on June 13, 2002. At that time, she reported to him that her left knee had given out while she was walking to the mailbox. An x-ray on her left ankle and leg revealed a slight bowing in her fibula. He recommended that a MRI be performed on her left ankle, to make certain that no other injuries had been overlooked because she was continuing to have chronic pain in her left leg and knee. The MRI was performed, but revealed no problems in the bones, ligaments or tendons of Mrs. Barr's left ankle. Dr. Jones, IV, and Dr. Jones, III, at that time, determined that there was nothing that could surgically be done to alleviate Mrs. Barr's pain and that the only course available would be to continue to treat her symptoms, and shared that conclusion with her when she returned to their office on June 19, 2002.

Mrs. Barr returned to Dr. Jones, III, on March 6, 2003. She reported that she had changed jobs and was, at that point in time, working for Keebler Company. She told him that she was experiencing a great deal of pain in her left leg anytime she negotiated stairs and was still experiencing burning and stinging in her left foot. Dr. Jones, III, prescribed medication in an effort to alleviate Mrs. Barr's pain.

Mrs. Barr returned to Dr. Jones, III, on May 15, 2003, still complaining of pain. He again prescribed pain medication for her. At that point in time, he and Dr. Jones, IV, reached the conclusion that Mrs. Barr, because of her condition, should seek employment in some job other than truck driving.

Dr. Jones, IV, testified that, during the entire time he has treated Mrs. Barr, she has reported persistent pain in her left leg, "a burning type of pain and achiness that runs from her ankle all the way up to her knee...," and "an inability to feel very accurately on the top her foot due to the injury...," that she suffered on July 2, 2001. Dr. Jones' deposition, page 23. For that reason, he referred her to Dr. Roland Rivard, who is, "a specialist in determining permanent restrictions and limitations and disabilities...," in an effort to quantify the extent of her physical limitations. Dr. Jones' deposition, page 23.

Dr. Rivard conducted a thorough evaluation of Mrs. Barr and reported the results of that evaluation to Dr. Jones, IV, on July 10th, 2003. That report, which, of course, is based on Dr. Rivard's opinions, indicates that Mrs. Barr has a 24% permanent partial impairment of her left lower leg, which equates to a 10% permanent partial impairment of her body as a whole. He determined that Mrs. Barr's abilities to sit, even for long periods of time, stoop, kneel, crouch and reach, are not impaired and that she should be able to perform those activities in connection with any work she may obtain without restriction. But he determined that her abilities to stand, walk, lift, climb, balance and squat were impaired, to some extent, and recommended that any employment she might undertake be subject to the following limitations:

1. Her standing and walking should be limited to 2/3 of a normal 8 hour shift.

2. Her lifting should be limited to a maximum of 50 pounds and any frequent lifting and carrying should be limited to 40 pounds.

3. She should only climb stairs and ladders occasionally.

4. She should only be required to balance (i.e., to prevent falling on a narrow, slippery or erratically moving surface) occasionally.

5. She is unable to perform a full squat.

Dr. Jones, IV, testified that he has thoroughly reviewed Dr. Rivards' conclusions, opinions, and recommendations and is in complete agreement with them.

41

Dr. Jones, IV, examined Mrs. Barr again on July 21, 2003. She again reported to him that she was having a great deal of difficulty with her left leg and continued decreased sensation in the area of her left foot. At that point, she was still working for Keebler's Company driving a truck.

Mrs. Barr returned to Dr. Jones, IV, on December 5, 2003. She again reported pain in her left leg and foot. She told him that she was probably going to have to give up her work as a truck driver; that her left leg was giving her difficulty anytime she walked on uneven surfaces and sometimes gave out on her; that her left leg was numb on the lateral side and felt clumsy. Dr. Jones' impression was that Mrs. Barr should quit her job driving, loading and unloading trucks and obtain training for some other employment.

Dr. Jones, IV, last examined Mrs. Barr, prior to his deposition, on October 18, 2004. On that occasion, she reported continued numbness and tingling, and a burning sensation in her left foot, and pain radiating from her left ankle to her left knee. She told him that she was having difficulty leading with her left foot when negotiating stairs.

Dr. Jones testified that, in his opinion, Mrs. Barr's current physical condition has not improved from what it was when she was evaluated by Dr. Rivard. Consequently, in his opinion, Dr. Rivard's evaluation still accurately represents the present state of Mrs. Barr's limitations and disability. She still would have difficulty standing for any significant amount of time or walking for any significant distance. She would have difficulty squatting or kneeling down. Also, any activities that might involve positioning or manipulation of her left ankle, such as operating an instrument or machine that requires use her left foot, would be difficult for her. In his opinion, it is probable that her left leg will require future medical care. The loss of sensation in her left ankle is probably stable. The pain in her left ankle may be aggravated as a result of the normal aging process.

Dr. Jones testified that Mrs. Barr has been a cooperative patient. He does not believe that she has been faking any of her complaints. In his opinion, her reports of pain in her left leg and ankle, and numbness in her ankle and foot, are "consistent" with the injuries that she suffered on July 2, 2001. Dr. Jones' deposition, page 52.

The records pertaining to and reflecting the medical services and supplies provided to Mrs. Barr for treatment of the injuries that she received on July 2, 2001, and the charges incurred by her for those services and supplies, are attached to Dr. Jones' deposition. Mrs. Barr's incurred total charges for those services and supplies of $34,655.54. Dr. Jones was presented with those records and medical bills. He testified that, in his opinion, all of the services and supplies provided to Mrs. Barr, which are reflected in those records, were necessary for the treatment of those injuries and all of the charges billed for those services and supplies are reasonable, and customary, and in line with the cost of similar services and supplies ordinarily provided in the same, relevant medical community.

42

## B.  Calculation of Damage Award

### 1.  Lost Past Wages: $9,333.33

Mrs. Barr was totally disabled from the day that she was injured, until October 26, 2001, a period of approximately 4 months.  Her annual salary at the time was around $28,000.00, or $2,333.33 a month.  So, as an initial matter, she lost $9,333.33 before she was able to return to work.

### 2.  Lost Future Wages: $40,632.32

Mrs. Barr has suffered a 10% disability to her body as a whole.  Furthermore, she has been rendered unable to work in her chosen profession.  She tried to return to work as a truck driver, but was not able to perform the physical tasks which that job requires.

Mrs. Barr is not, however, untrainable, or unemployable.  And she presented essentially no evidence regarding what jobs she is or is not qualified to do, other than drive a truck, or what she can earn or might be able to earn from other types of work, or the availability vel non to her of other forms of employment.  Consequently, as far as the loss of future wages, the only basis the Court has for determining her anticipated lost future wages is the 10% disability figure, as applied to the wages that she was earning when she suffered her injuries.

Mrs. Barr's final retirement age, for social security purposes, is 67, according to the Social Security Administration.[11]  Her birth date is February 28, 1961.  She will be 67 years old on February 28, 2028.  She was, after suffering her injuries, cleared to return to work on October 26, 2001.  According to her testimony, she worked until September of 2003.  There are 24 years and five months between the first of October 2003 and Mrs. Barr's final retirement age.  Assuming that Mrs. Barr, had she not been injured, would have continued to earn $2,333.33 a month during that period, she would have, during that period, earned at least $683,665.69.  Given a 10% reduction in her earning capacity, corresponding to the 10% disability to her body as a whole, she is now, capable of earning only 90% of what she could have otherwise earned.  Accordingly, instead of earning $683,665.69 over her remaining working years, Mrs. Barr is now capable of earning only $615,299.12.  Consequently, it must be concluded that Mrs. Barr will, as a result of her injuries, have lost $68,366.56, or, in other words, 10% of the amount that she could have otherwise earned.

---

[11] Social Security Administration, Full Retirement Age, available at http://www.ssa.gov/ retire2/retirechart.htm#chart (June 12, 2005).

43

Under Alabama law, damages awarded for lost future wages must be reduced to present value.[12] However, the appropriate discount rate to be used to accomplish that result is not specified and is apparently left to the discretion of the fact finder. Because the plaintiff did not prove what discount factor should be employed to compute the present value of her lost future wages, the Court will employ, as the appropriate discount factor, 4.80%, which is the rate of return being earned on "I Bonds" purchased from the United States Department of the Treasury from May through October 2005.[13] Also, the amount to be discounted will be expressed as a stream of payments in the amount of $233.33, or 10% of Mrs. Barr's monthly income, for 293 months, which is the number of times that she would, but for her injuries, have received a payment of that amount as part of her regular paycheck. Application of the 4.80% factor to the future wages which will have been lost by Mrs. Barr as a result of her injuries produces an award for discounted lost future earnings in the amount of $40,632.32.

### 3. Medical Expenses: $3,500

The collateral source rule has been abrogated in Alabama. Code of Ala., 1975, § 12-21-45. Mrs. Barr testified that she is out-of-pocket $3,500 for expenses which she has incurred for the treatment of her injuries. She presented no evidence regarding what, if anything, she may have to pay to obtain future treatment for those injuries. Consequently, for medical expenses relating to the past treatment of her injuries, she is

---

[12] Alabama Pattern Jury Instruction-Civil § 11.11 provides as follows

In arriving at the amount of your award for any loss of [future earnings] [earnings capacity], you should consider what the plaintiff's health, physical ability and earning power or capacity were before the accident and what they are now; the nature and extent of his injuries, and whether or not they are reasonably certain to be permanent; or if not permanent, the extent of their duration; all to the end of determining, first, the effect, if any, of his injury upon his [future earnings] [earning capacity], and second, the present cash value of any loss of [future earnings] [earning capacity) which you are reasonably satisfied from the evidence in the case that plaintiff is reasonably certain to suffer in the future, as a proximate result of the injury in question.

"Present cash value" means the sum of money needed now, which, when added to what that sum may reasonably be expected to earn in the future, will equal such earnings at the time in the future when these earnings would have been received.

Alabama Pattern Jury Instructions Committee-Civil, Alabama Pattern Jury Instructions Civil § 11.11 (Second Edition 2004) (parentheticals added).

[13] Bureau of the Public Debt, United States Savings Bonds Earning Report (May 2005 thru Apr 2006), available at http://www.publicdebt.treas.gov/sav/sber1105.pdf (June 12, 2005).

44

entitled to an award of $3,500. And she is entitled to no award for prospective medical expenses.

### 4. Pain, Mental Anguish, and Impaired
### Physical Functions: $296,000

Mrs. Barr is entitled to compensation for her pain, mental anguish, and impaired physical functions. For that the Court finds that an award for $296,000 should be made. That amount is comprised of $50,000 for Mrs. Barr's initial injury and pain and $246,000 for her future pain and physical impairment.

### A. Initial Injury and Associated Recovery

Mrs. Barr suffered extreme physical pain and mental anguish when she was hit by the truck; while she lay on the ground with the truck on her foot; while she was waiting for the ambulance to arrive; while she was being transported to the hospital by the ambulance; and during her stay at the hospital, which involved two surgeries and a number of painful whirlpool baths designed to clean out her wounds and keep them clean. And she also suffered significant physical pain and mental suffering during her post-hospital period of rehabilitation. For that intense pain and mental suffering, the Court will award Mrs. Barr $50,000.

### B. Diminished Physical Ability
### and Future Pain and Mental Anguish

Mrs. Barr continued to suffer a moderate yet tolerable level of pain and mental anguish on a daily basis after her initial period of recuperation and rehabilitation. Furthermore, to this day, she is in constant pain and discomfort, which she is able to function with and tolerate, but which, of course, she would never have chosen to deal with at any cost.

Moreover, in addition to restricting her ability to earn a living, Mrs. Barr's 10% total disability naturally impairs her ability to function and perform normally during the time she is not at work. For example, the daily pain from her injuries prevents her from sleeping soundly. And the numbness in her left ankle and foot sometimes causes her to stumble and fall.

According to the mortality tables adopted by the Alabama Commissioner of Insurance, Mrs. Barr's life expectancy, computed from the date she was first cleared to return to work in October 2001, is approximately 41 years, which equates to 492 months.[14] During each of those months, Mrs. Barr will cope with physical impairment,

---

[14] Alabama Department of Insurance, Commissioners 2001 Standard Ordinary Mortality Table, available at http://www.aldoi.org/PDF/Consumers/MortalityTable2001.pdf (June 12,

Case 04-00032-TOM    Doc 24    Filed 09/28/05    Entered 09/28/05 12:42:28    Desc Main
Document        Page 45 of 47

inconvenience, discomfort, and aggravation, all because of the injuries caused by Mr. Steadman.

For that physical pain and mental anguish, and diminished physical ability that Mrs. Barr suffered from the day that she was cleared to return to work in October 2001 through the day the trial of this matter took place; and for the physical pain and mental anguish, and diminished physical ability that she, according to the evidence, will continue to suffer in the future, the Court will award Mrs. Barr the sum of $246,000. That amount represents the small amount of $500.00 for each month Mrs. Barr can be expected to suffer from the injuries caused to her by Mr. Steadman. That amount is eminently reasonable. To put it in perspective, it would be difficult to find someone who would be willing to bear Mrs. Barr's pain, mental anguish and physical debility for that amount, 24 hours a day, 365 days a year, for the rest of his or her life.

### 5. Pro Tanto Reduction: $100,000

Prior to the filing by Mr. Steadman of his bankruptcy petition, Mrs. Barr sued Ms. Ware and him in state court. Mr. Steadman's bankruptcy filing interrupted Mrs. Barr's suit against him. But Mrs. Barr reached a pro tanto settlement with Ms. Ware which resulted in the payment by the latter to the former of $100,000. Because Mrs. Barr is entitled to only one recovery, regardless of how many joint tortfeasors she has sued, the $100,000 she received from her settlement with Ms. Ware must be deducted from the damages that will be awarded to her in this case.[15]

### 6. Total Damage Award: $249,465.65

Having proved that her injuries were caused by the willful and malicious malfeasance of Mr. Steadman, Mrs. Barr is entitled to recover damages against him in

---

2005).

[15] Alabama Pattern Jury Instructions Committee-Civil, Alabama Pattern Jury Instructions Civil § 11.30 (Second Edition 2004) read:

> The plaintiff originally made claim against (party released) and  (_____) the defendant(s) in this case for damages growing out of the (the occurrence made the basis of this suit). The plaintiff in consideration of the sum of $_____ released (party released) and reserved (his) (her) right to proceed against the present defendant(s)_____.  If you are reasonably satisfied from the evidence that the plaintiff is entitled to recover in this case then in arriving at the amount of damages to be awarded to the plaintiff you will determine from the evidence the total amount of damages suffered by the plaintiff and then give credit for the amount of $_____ which the plaintiff has already been paid by (party released) and render a verdict for the plaintiff for the balance remaining.

an amount that will fairly and reasonably compensate her for those injuries.[16]  As indicated above, the Court has concluded that Mrs. Barr should be awarded damages against Mr. Steadman in the total amount of $249,465.65. That includes $9,333.33 for wages lost before she was able to return to work; $40,632.32 in additional wages that she will lose as a result of those injuries by the time she reaches retirement age, reduced to their present value; $3,500 in out-of-pocket medical expenses; $296,000 for pain, mental anguish, and non-work related physical impairment, less the $100,000 settlement Mrs. Barr received from Ms. Ware in the state court lawsuit.

### III.  CONCLUSION

Mrs. Barr proved by a preponderance of the evidence that she was willfully and maliciously injured by Mr. Steadman.  Consequently, the debt owed by Mr. Steadman to Mrs. Barr, that is the amount necessary to compensate Mrs. Barr fairly and reasonably for her injuries, is, by virtue of 11 U.S.C. § 523(a)(6), not dischargeable.  That amount is, as determined by the Court in this proceeding, $249,465.65.  A separate order will, therefore, be entered in accordance with this Memorandum Opinion, awarding a judgment of $249,465.65 against Mr. Steadman and declaring that judgment to be nondischargeable by him in his pending Chapter 7 bankruptcy case.

This order is a written opinion for purposes of the E-Government Act, Pub. L. No. 107-347.

Done this the 28th day of September, 2005.

/s/Benjamin Cohen_____
BENJAMIN COHEN
United States Bankruptcy Judge

BC:sm
cc:  Mr. Danny Lockhart, attorney for Mr. Steadman
     Mr. Frank G. Alfano, attorney for Mrs. Barr
     Trustee

---

[16] Alabama Pattern Jury Instructions Committee-Civil, Alabama Pattern Jury Instructions Civil § 11.02 (Second Edition 2004) read:

> The purpose of awarding compensatory damages is to fairly and reasonably compensate the injured party for the loss or injury sustained. Compensatory damages are intended as money compensation to the party wronged, to compensate him for his injury and other damages which have been inflicted upon him as a proximate result of the wrong complained of.

47